# FOR PUBLICATION
# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellant,*

                v.

AHMED RESSAM,
           *Defendant-Appellee.*

No. 09-30000

D.C. No.
2:99-cr-00666-
JCC-1

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted
September 21, 2011—San Francisco, California

Filed March 12, 2012
Amended May 4, 2012

Before: Alex Kozinski, Chief Judge, and
Mary M. Schroeder, Stephen Reinhardt, Susan P. Graber,
M. Margaret McKeown, Kim McLane Wardlaw,
Richard A. Paez, Marsha S. Berzon, Richard R. Clifton,
Jay S. Bybee, and Mary H. Murguia, Circuit Judges.

Opinion by Judge Clifton;
Concurrence by Judge Reinhardt;
Dissent by Judge Schroeder

4667

## COUNSEL

Helen J. Brunner (argued), Assistant United States Attorney, and Mark N. Bennett, First Assistant United States Attorney, Seattle, Washington, for the plaintiff-appellant.

Thomas W. Hillier, II, Federal Public Defender, Seattle, Washington, for the defendant-appellee.

## ORDER

The majority opinion is amended as follows:

1.  On page 2816 of the slip opinion, change the first sentence of the last paragraph from:

> Upon our review of the record, we have a definite and firm conviction that the district court committed

a clear error of judgment in sentencing Ressam as it did.

to

Upon our review of the record, we conclude that the district court abused its discretion in sentencing Ressam as it did.

2.   On page 2844 of the slip opinion, change the citation at the end of the second paragraph from:

*United States v. Hinkson*, 611 F.3d 1098, 1114 (9th Cir. 2010) (en banc) (internal quotation marks omitted), *cert. denied*, 131 S.Ct. 2096.

to

*United States v. Hinkson*, 585 F.3d 1247, 1260 (9th Cir. 2009) (en banc) (quoting *United States v. 4.85 Acres of Land, More or Less, Situated in Lincoln County, Mont.*, 546 F.3d 613, 617 (9th Cir.2008)), *cert. denied*, 131 S.Ct. 2096 (2011).

Add a new footnote 8 at the end of that paragraph, following the revised citation (renumbering subsequent footnotes accordingly), as follows:

In *Hinkson*, we adopted a two-part objective test to define in more precise terms what is required to support a conclusion that there was an abuse of discretion. That test "requires us first to consider whether the district court identified the correct legal standard for decision of the issue before it. Second, the test then requires us to determine whether the district court's findings of fact, and its application of those findings of fact to the correct legal standard, were illogical, implausible, or without support in infer-

ences that may be drawn from facts in the record."
*Id*. at 1251.

3.    On page 2865 of the slip opinion, change the last paragraph from:

> Because we are left with a definite and firm conviction that the district court committed a clear error of judgment in sentencing Ressam as it did, including by basing that sentence on several findings that were clearly erroneous, the sentence is vacated as substantively unreasonable, and the case is remanded to the district court for resentencing.

to

> Because we conclude that the district court abused its discretion in sentencing Ressam as it did, including by basing that sentence on several findings that were clearly erroneous, the sentence is vacated as substantively unreasonable, and the case is remanded to the district court for resentencing.

Footnote 10 (now re-numbered 11) is retained at the end of the revised paragraph.

---

## OPINION

CLIFTON, Circuit Judge:

The government appeals the sentence imposed by the district court upon Ahmed Ressam, the so-called "Millennium Bomber," as substantively unreasonable. We review a challenge of that nature under what the Supreme Court has described as "the familiar abuse-of-discretion standard of review." *Gall v. United States*, 552 U.S. 38, 46 (2007).

Ressam was convicted by a jury on nine counts of criminal activity[1] in connection with his plot to carry out an attack against the United States by detonating explosives at the Los Angeles International Airport, commonly known and referred to by its airport code "LAX." His plan was for the attack to occur on the eve of the new millennium, December 31, 1999. The advisory Sentencing Guidelines imprisonment range for Ressam's convictions was calculated by the district court to be 65 years to life. That calculation has not been challenged by either party. The district court sentenced Ressam to a term of imprisonment of 22 years, plus five years of supervised release.

Upon our review of the record, we conclude that the district court abused its discretion in sentencing Ressam as it did. As a result, we conclude that the sentence imposed by the district court was substantively unreasonable. We vacate the sentence and remand the case to the district court for resentencing.

## I.   Factual Background and Procedural History

As discussed below, our review of a sentence for substantive reasonableness is to consider the "totality of the circumstances" regarding the particular defendant. *Gall*, 552 U.S. at 51; *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008)

---

[1]Specifically, Ressam was convicted of (1) conspiring to commit an act of terrorism transcending national boundaries, in violation of 18 U.S.C. § 2332b(a)(1)(B); (2) conspiring to place an explosive in proximity to a terminal, in violation of 18 U.S.C. § 33; (3) possession of false identification documents in connection with a crime of violence, in violation of 18 U.S.C. § 1028(a)(4) and (b)(3)(B); (4) use of a fictitious name for admission into the United States, in violation of 18 U.S.C. § 1546; (5) making false statements on a customs declaration, in violation of 18 U.S.C. § 1001; (6) smuggling explosives into the United States contrary to law, in violation of 18 U.S.C. § 545; (7) transportation of explosives, in violation of 18 U.S.C. §§ 842(a)(3)(A) and 844(a); (8) possession of an unregistered destructive device, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871; and (9) carrying an explosive during the commission of a felony, in violation of 18 U.S.C. § 844(h)(2).

(en banc). As a result, we will describe in some detail the relevant circumstances, the arguments presented to the district court, and the district court's explanation of the sentence that it imposed.

Ahmed Ressam is an Algerian national. Traveling on a false Moroccan passport issued in the name of Nassar Ressam, he left Algeria in 1992 and went to France. In 1993 French authorities deported him to Morocco and banned him from returning to France for three years. He was returned to France by Moroccan authorities when it was determined that he was not Moroccan.

In 1994 Ressam arrived at Mirabel Airport in Montreal, Canada, using an illegally altered French passport. When Canadian immigration personnel confronted him, he divulged his true name and applied for refugee status, indicating on his application that he left Algeria in December 1993 after having been arrested and jailed for 15 months for arms trafficking to terrorists in Algeria. Ressam's request for refugee status in Canada was denied. A moratorium on deportations from Canada to Algeria allowed him to stay in Canada, however, under conditions set by the Canadian government. He failed to comply with those conditions, and in May 1998 a warrant was issued for his arrest. He was not arrested, however, because at the time the warrant issued, he was attending a terrorist training camp in Afghanistan.

In March 1998, traveling under the name of Benni Noris, Ressam left Montreal for Karachi, Pakistan. In Karachi, he got in touch with Abu Zubeida, who was in charge of the Afghan terrorist training camps. While he was in Afghanistan, fatwahs were issued, including one by Sheikh Omar Abdel Rahman, directing the terrorists to fight Americans and hit their interests everywhere.

Between March 1998 and February 1999, Ressam attended three training camps for Islamic terrorists in Afghanistan. He

first received instruction at Khalden Camp in light weapons (handguns, machine guns, and rocket launchers), the making of explosive devices (including TNT, C4 plastic explosives, and black plastic explosives), sabotage, the selection of targets, urban warfare, tactics (including assassinations), security, and the use of poisons and poisonous gas. The sabotage training included learning how to disrupt the infrastructure of a country, by destroying locations such as electric plants, gas plants, airports, railroads, and hotels. The urban warfare training instructed on how to carry out operations in cities, how to block roads, how to assault buildings, and covered the strategies used in these operations. Explosives training included how to do surveillance, take pictures, and blend in by wearing clothing that a tourist would wear. The weapons and ammunition used at the camps were supplied by the Taliban. Plans were underway to carry out terrorist operations in Europe and elsewhere.

After attending Khalden Camp, Ressam moved to Toronta Camp located outside Jalalabad, Afghanistan, where he was trained over the course of a month and a half in the manufacture of explosives. He learned how to put chemical substances together to form explosives and how to make electronic circuits to be used to blow things up.

Ressam and five other terrorists were part of a cell charged with carrying out an operation against a target in the United States—an airport or a consulate—before the end of 1999. The leader of the cell was to stay in touch with Abu Jaffar in Pakistan and Abu Doha in Europe. The plan was for the cell's members to travel separately and meet in Canada, where they would carry out bank robberies to finance their operation in the United States.

In February 1999, Ressam returned to Canada, traveling under the name Benni Noris and carrying $12,000 in cash, a chemical substance called Hexamine used as a booster in the

manufacture of explosives, and a notebook with instructions on how to put together explosives.

In the summer of 1999, Abu Doha informed Ressam, from London, that the other members of the Montreal cell had decided to remain in Europe because they ran into immigration problems. Ressam decided to continue with the operation without the other members of his cell. He chose LAX as his target, knowing that, as a result, many civilians would die.

While planning the operation, Ressam worked with his friend, Ahcene Zemiri, who helped him plan a bank robbery intended to secure funds to finance the attack in the United States. Ressam and Zemiri did surveillance on the bank. Ressam asked Zemiri and Samir Ait Mohamed to obtain a pistol with a silencer and hand grenades to use during the bank robbery. Ressam planned to throw a live hand grenade at the police and run if he needed to do so in order to get away.

In November 1999, Ressam and his co-conspirator, Abdel Dahoumane, traveled from Montreal to Vancouver, B.C., where they prepared explosives for the LAX bomb in a rented cottage. On December 14, 1999, Ressam and Dahoumane traveled from Vancouver to Victoria, B.C., with all of the components of the bomb, including explosives, hidden in the wheel well of the trunk of a rental car. Continuing alone, Ressam drove the car carrying the explosives onto an American car ferry at Tsawwassen, B.C. The ferry arrived in Port Angeles, Washington, later that evening. Upon leaving the ferry, Ressam was questioned by a U.S. customs inspector. She detected nervousness and directed Ressam to a secondary inspection area.

Ressam filled out a customs declaration form falsely, stating that his name was Benni Noris and that he was a Canadian citizen. One customs inspector conducted a pat-down search on Ressam as others were searching the car. When an inspector discovered what appeared to be contraband in the wheel

well of the trunk, Ressam fled on foot. Customs inspectors gave chase. In the course of the chase, Ressam attempted to carjack a vehicle. He was apprehended by the customs inspectors and returned to the inspection area in a police car. The inspectors resumed searching the trunk of Ressam's car.

As the inspectors reached into the wheel well to remove the contraband, Ressam ducked down behind the protection of the police car's door. An explosives expert later determined that the materials found in the car were capable of producing a blast forty times greater than that of a devastating car bomb.[2]

Following his arrest, the government indicted Ressam on the nine counts identified above, at 4674, note 1. The statutory maximum penalty for these offenses was 130 years in prison.

Before trial, the government offered Ressam an agreement to recommend a sentence of 25 years of imprisonment in exchange for a guilty plea. The government considered the sentence offered to be substantially discounted, taking into

---

[2]As reported to the district court by the government, the following items were found in Ressam's car:

> two lozenge bottles filled with primary explosives, one of which contained hexamethylene triperoxide diamine (HMTD) and the other of which contained cyclotrimethylene trinitramine (RDX); 10 plastic bags of approximately 118 pounds total of urea in fine white powder form, which is a fertilizer that, when nitrated, can be used as a fuel in explosives; 2 plastic bags of about 14 pounds total of a crystalline powder determined to be aluminum sulfate; two 22-ounce olive jars each filled approximately 3/4 full of a golden brown liquid covered with a sawdust like substance, which liquified was determined to be an explosive, etheylene glycol dinitrate (EGDN). Also discovered with these chemicals were four timing devices, comprised of small black boxes which each contained a circuit board connected to a Casio watch and nine-volt battery connector. Tests later confirmed that the timing devices were operational. Ressam's fingerprints and hair were found in some of the timing devices.

account the risk of trial. At that time, the government was concerned that its evidence with regard to the most serious charge and the one that carried the most weight, count one of the indictment, alleging conspiracy to commit an act of terrorism transcending national boundaries, was thin. The government was uncertain about its ability to prove what Ressam intended to do once he crossed the border, using a phony passport and carrying more than 100 pounds of explosives. It was not until closer to the time of trial that some of the most important evidence was developed with regard to what Ressam intended to do with the explosives. Ressam rejected the pre-trial plea offer of 25 years.

Due to concern for possible prejudice because of public sentiment in the Seattle area, the trial judge granted Ressam's motion to transfer the site of the trial to Los Angeles. Following a 19-day trial involving approximately 120 witnesses and more than 600 exhibits, a jury convicted Ressam on all counts on April 6, 2001.

About one month after the jury verdict but before sentencing, counsel for Ressam informed the government that Ressam wished to cooperate with law enforcement authorities in the investigation of terrorist activities. The following week, on May 10, 2001, Ressam began meeting with government agents in an attempt to cooperate. Ressam's position was that the United States Attorney should agree upon a sentencing range of 10 to 15 years in prison in exchange for his cooperation. On June 22, 2001, the United States Attorney responded to Ressam's offer with a proposed cooperation agreement. Ressam signed the agreement the next day.

The cooperation agreement required Ressam's full cooperation with designated agencies and his truthful testimony in court proceedings as requested by the government, including but not limited to the trial of his co-conspirator, Mokhtar Haouari. In exchange, the government agreed to file a U.S.S.G. § 5K1.1 motion asking the court for a downward departure

from the applicable Sentencing Guidelines range of 65 years to life, a range which was then mandatory. The parties agreed that neither side would request a sentence of less than 27 years or greater than the high end of the Guidelines range, which was life imprisonment.

Between May 10, 2001, and September 11, 2001, Ressam met with government agents approximately 22 times. In July Ressam testified as a prosecution witness at the trial of Hauoari, who had recruited Abdelghani Meskini to support Ressam's terrorist plot to bomb LAX. *United States v. Haouari*, 2001 WL 1154714, at *2-4 (S.D.N.Y. Sept. 28, 2001). Meskini pleaded guilty and also testified against Hauoari. The jury found Hauoari guilty, and he was sentenced to 24 years in prison, two years short of the statutory maximum.

Based almost entirely upon information provided by Ressam, the government filed a complaint against Abu Doha, a major player in the arena of terrorist activity. Ressam was aware that the success of the government's attempts to extradite Doha from England depended exclusively upon a comprehensive declaration provided by Ressam. The government also relied on Ressam's information to file a complaint against Samir Ait Mohamed, and Ressam knew the success of that proceeding would depend on his continued cooperation.

After the terrorist attacks that occurred on September 11, 2001, Ressam identified Zacarias Moussaoui from a photograph as an individual whom he had met at the Khalden training camp. Ressam also provided information that assisted law enforcement in determining that the shoe confiscated from Richard Reid, the so-called "Shoe Bomber," was a complete device that needed to be disarmed before being put on a plane for transport to a lab for analysis.

Six months after entering into the cooperation agreement with the government, Ressam began to show reluctance to discuss certain matters. FBI Special Agent Humphries, who

worked with Ressam from the commencement of his cooperation with the government, testified that in a June 2001 interview, Ressam had talked with him at length about Nacer Hamaidi, an individual in Vancouver, B.C., who had assisted Ressam. This information was passed on to Canadian authorities, but when officers from the Royal Canadian Mounted Police traveled to the United States to interview him, Ressam would no longer discuss Hamaidi, despite Agent Humphries' effort to encourage him to do so. Agent Humphries later testified that this was the first time there was a disconnect in the rapport with Ressam.

Between September 11, 2001, and February 11, 2002, Ressam met with government agents on approximately 15 occasions, including his participation in a deposition hearing in New York related to prosecutions taking place against criminal defendants in Germany.

In February 2002, nine months after Ressam began his cooperation with the government, Ressam's counsel met with federal prosecutors and sought to renegotiate the terms of the parties' cooperation agreement, particularly its 27-year floor. According to Ressam's counsel, Ressam was suffering from anxiety related to his impending sentence, his conditions of confinement were compromising his physical and mental well-being, and he wanted closure. The prosecutors stated that Ressam's cooperation to date was not of a nature to lead them to consider recommending a sentence at the agreement's 27-year floor, let alone dissolving that floor. The government responded to Ressam's complaint about the conditions of his confinement in the FDC SeaTac Special Housing Unit by reminding him that these conditions were influenced by the nature of his criminal acts and the serious charges on which he had been convicted. The government offered to assist Ressam in getting into the witness security program for prisoners in federal custody, which could result in a less onerous housing situation, albeit at some distance from Seattle. Ressam declined the offer.

The district court granted several sentencing continuances to allow Ressam to cooperate further with the government. He continued cooperating to some degree until early 2003. Over the course of his two-year cooperation, he provided 65 hours of trial and deposition testimony and 205 hours of proffers and debriefings. He provided information to the governments of seven different countries and testified in two trials, both of which ended in convictions of the defendants. He provided names of at least 150 people involved in terrorism and described many others. He also provided information about explosives that potentially saved the lives of law enforcement agents, and extensive information about the mechanics of global terrorism operations.

In February 2003 the government filed a motion for a further continuance of Ressam's sentencing and requested an adjournment pursuant to the terms of his cooperation agreement with the government. The government informed the district court that, relying on Ressam's promise to cooperate, Abu Doha had been ordered extradited by a court in London to the United States for prosecution, and the government was in the process of extraditing Samir Ait Mohamed from Canada. The government stated in its motion that it had not yet decided on its position with respect to a § 5K1.1 motion and that, if forced to make a motion at that time, the government would likely make a sentencing recommendation calling for a considerably longer period of incarceration than it might had Ressam completed his promised cooperation.

On February 26, 2003, the district court held a hearing on the government's motion for a continuance. At the hearing, the district court told the government it would grant a continuance conditioned upon the immediate filing of a § 5K1.1 motion for a downward departure based upon Ressam's cooperation. The government filed a § 5K1.1 motion that same day, based on his substantial assistance in the Haouari prosecution.

Nevertheless, Ressam was unwilling to continue cooperation. Concerned about Ressam's state of mind and demeanor, in October 2003 Ressam's counsel consulted with Dr. Stuart Grassian, a Board-certified psychiatrist specializing in evaluating the psychological effects of stringent conditions of imprisonment. Dr. Grassian met with Ressam in November 2003 and concluded that his conditions of confinement played a very significant role in the deterioration of his state of mind. In February 2004, Dr. Grassian met in New York City with Ressam's counsel, members of the United States Attorney's Office, and behavioral science experts from the FBI.

It was decided that Ressam would be moved to a prison environment that would afford him more environmental, social, and occupational stimulation. The transfer was effected in June 2004. Dr. Grassian met with Ressam again in October 2004 and observed that he appeared to be less tense and that his thinking was strikingly clearer. Dr. Grassian reported that Ressam realized that he had made a solemn promise to cooperate, and that his continued refusal to testify and speak with the government could have serious adverse consequences in regard to his sentence and his custody status. He did not resume cooperation, however, and by November 2004, Ressam's counsel made it clear that his cooperation was finished and that he wanted to be sentenced.

A sentencing hearing was held on April 27, 2005. Contrary to the terms set forth in the June 23, 2001 cooperation agreement, which provided that neither party would recommend a sentence of less than 27 years, Ressam requested a sentence of 12-1/2 years (150 months) of imprisonment. His position was that the starting point should be the government's pretrial plea offer of 25 years, rather than the Sentencing Guidelines range of 65 years to life.

The government recommended a sentence of 35 years of imprisonment, noting that by ending his cooperation, Ressam had effectively terminated at least two criminal cases of vital

interest to national security. The government acknowledged that Ressam had provided valuable assistance to the United States and to foreign authorities, and it filed a summary of debriefings, proffers, and testimony provided by him. Based on that assistance, the government recommended a sentence that represented a substantial reduction from the 65-year bottom of the Guidelines range, despite his breach of the cooperation agreement.

Agent Humphries, who was involved throughout the duration of Ressam's cooperation, testified concerning the information received from Ressam and its usefulness. Agent Humphries stated that Ressam's information was helpful in providing a personal account of his movement from North America through Europe and into Afghanistan via safe houses in Pakistan. He also testified that most of the information Ressam provided to the FBI was already known within the U.S. intelligence community from classified sources, but Ressam served as an unclassified source, which permitted the federal government to provide the previously classified information to other law enforcement and intelligence services throughout the world without the same risk of exposing the original classified source.

Ressam argued that his cooperation was worth a greater reduction in his sentence. He claimed that he had ceased cooperating, in part, because he was having trouble remembering details. Ressam submitted a psychiatric report prepared by Dr. Grassian wherein he opined that the combination of solitary confinement and repeated interrogations had a negative effect on Ressam's mental health, though the district court commented that "it strikes me that a lot of the details that he's not remembering now are things that one would not forget." Dr. Grassian further stated that Ressam's history provided strong evidence that he would not be a danger to the community.

At the district court's urging, Ressam asked for a three-month continuance of the sentencing hearing to allow him to

consider whether he was willing to cooperate further in the prosecutions of Doha and Mohamed. Over the government's objection, the district court continued the hearing.

Ressam's cooperation did not improve during the three months that followed. On July 27, 2005, the district court held another sentencing hearing and heard argument from both sides, which largely repeated the arguments presented at the April 27, 2005 hearing.

At the conclusion of the hearing, the district court sentenced Ressam to 22 years of imprisonment, plus five years of supervised release. After pronouncing the sentence, the district court provided the following explanation:

> Okay. Let me say a few things. First of all, it will come as no surprise to anybody that this sentencing is one that I have struggled with a great deal, more than any other sentencing that I've had in the 24 years I've been on the bench.

> I've done my very best to arrive at a period of confinement that appropriately recognizes the severity of the intended offense, but also recognizes the practicalities of the parties' positions before trial and the cooperation of Mr. Ressam, even though it did terminate prematurely.

> The message I would hope to convey in today's sentencing is two-fold: First, that we have the resolve in this country to deal with the subject of terrorism and people who engage in it should be prepared to sacrifice a major portion of their life in confinement.

> Secondly, though, I would like to convey the message that our system works. We did not need to use a secret military tribunal, or detain the defendant

indefinitely as an enemy combatant, or deny him the right to counsel, or invoke any proceedings beyond those guaranteed by or contrary to the United States Constitution.

I would suggest that the message to the world from today's sentencing is that our courts have not abandoned our commitment to the ideals that set our nation apart. We can deal with the threats to our national security without denying the accused fundamental constitutional protections.

Despite the fact that Mr. Ressarn is not an American citizen and despite the fact that he entered this country intent upon killing American citizens, he received an effective, vigorous defense, and the opportunity to have his guilt or innocence determined by a jury of 12 ordinary citizens.

Most importantly, all of this occurred in the sunlight of a public trial. There were no secret proceedings, no indefinite detention, no denial of counsel.

The tragedy of September 11th shook our sense of security and made us realize that we, too, are vulnerable to acts of terrorism. Unfortunately, some believe that this threat renders our Constitution obsolete. This is a Constitution for which men and women have died and continue to die and which has made us a model among nations. If that view is allowed to prevail, the terrorists will have won.

It is my sworn duty, and as long as there is breath in my body I'll perform it, to support and defend the Constitution of the United States.

Ressam appealed from his conviction on count nine of the indictment, for carrying an explosive during the commission

of a felony. In a cross-appeal, the government challenged Ressam's sentence as substantively unreasonable. We reversed the conviction on count nine. *United States v. Ressam*, 474 F.3d 597 (9th Cir. 2007). Because that reversal required resentencing, we vacated Ressam's sentence and remanded without discussing the merits of the government's argument that the sentence was unreasonable. *Id.* at 604.

The Supreme Court reversed this court's decision and reinstated the conviction on count nine. *United States v. Ressam*, 553 U.S. 272 (2008). On remand, we vacated the sentence and remanded for resentencing because the district court had not determined the applicable Guidelines range, as required under our intervening en banc panel decision in *Carty*. *United States v. Ressam*, 538 F.3d 1166, 1167 (9th Cir. 2008) (order).

While the matter was on appeal, Ressam sent a letter to the district court recanting his prior testimony implicating Ahcene Zemiri in his terrorist plot. Similarly, in a letter to the United States Attorney's Office, Ressam recanted his previous testimony against Haouari. In the letter, Ressam claimed that he was not mentally competent when he testified against Haouari and that Haouari "is an innocent man." *Haouari v. United States*, 510 F.3d 350, 352 (2d Cir. 2007). Haouari submitted Ressam's letter as "newly discovered evidence" sufficient to warrant the filing of a second or successive 28 U.S.C. § 2255 petition, but that motion was denied. *Id.* at 352, 354.

After the imposition of the original sentence in July 2005 but before the resentencing hearing that was ultimately held on December 3, 2008, the district judge joined the public debate over the proper place to try persons accused of being terrorists, in testimony before the Senate Judiciary Committee and in op-ed columns in national newspapers. *See Improving Detainee Policy: Handling Terrorism Detainees within the American Justice System Before the Senate Comm. on the Judiciary*, 110th Cong. 110-455 (2008); John C. Coughenour,

*How to Try a Terrorist*, N.Y. Times, Nov. 1, 2007;[3] John C. Coughenour, *The Right Place to Try Terrorism Cases*, Wash. Post, July 27, 2008.[4] In those statements, the judge cited his experience with the Ressam case in support of his opinion that traditional federal courts were the appropriate place to put accused terrorists on trial.[5]

The resentencing hearing was held on December 3, 2008. The district court began by calculating the applicable Sentencing Guidelines range for Ressam's crimes of conviction at 65 years to life, including a ten-year mandatory prison sentence for count nine to run consecutively to the sentences for all other charges. Before imposing sentence, the district court heard from the parties.

Appearing without counsel, by his own choice, Ressam told the district court that he recanted his testimony against Maktar Haouari and all statements implicating Abu Doha and Samir Ait Mohamed. Ressam made the following statement before the district court at his sentencing hearing:

---

[3]Available at http://www.nytimes.com/2007/11/01/opinion/01coughe-nour.html (last visited Nov. 10, 2011).

[4]Available at http://www.washingtonpost.com/wp-dyn/content/article/2008/07/25/AR2008072502759.html (last visited Nov. 10, 2011).

[5]The Washington Post column of July 27, 2008, for instance, began with the following paragraph:

> I have spent 27 years on the federal bench. In particular, my experience with the trial of Ahmed Ressam, the "millennium bomber," leads me to worry about Attorney General Michael Mukasey's comments last week, urging Congress to pass legislation outlining judicial procedures for reviewing Guantanamo detainees' habeas petitions. As constituted, U.S. courts are not only an adequate venue for trying terrorism suspects but are also a tremendous asset in combating terrorism. Congress risks a grave error in creating a parallel system of terrorism courts unmoored from the constitutional values that have served our country so well for so long.

I suffered severe shock after the trial and I lost my mental faculty and I did not know what I was saying. The government attorney and the investigator, they know about my mental condition that I was going through, and about my mental faculty and the procedure exposed to their own interests. They interpret some of my statements to suit their interests. And the statement that was put in my mouth, which I said yes, because—due to the extreme mental exhaustion I was going through. I also am subject of pressures put upon me by the attorneys and the investigators.

The evidence presented in court should be obtained from a solid source that cannot be doubted. But if the evidence and the statements are obtained from dubious sources or under pressure or a threat or from a mental incompetent source it should not be admitted. And that is the situation I was in.

I sent in the past a letter to the government attorney Joe Bianco, in which I retrieved all my statements that I gave in the investigation in the past; all those I gave during the testimony of Makhtar Haouari in the New York court because I neither proceed my mental faculties (sic) or I know what I was saying.

The New York judge was suspicion of my letter, and he thought that I was doing that because—and I did not because in order—He thought that I was doing that because I had nothing to lose and because I was already tired. I did not do that in order to win or to lose. First, I did that because I was not mentally competent and I did not know what I was saying. Second, I did that because—in the presence of that judge. I retract all. I repeat, all of the statements that I made in the past and do not want my word counted

in my trial. So sentence me to life in prison or as you wish. I have no objection to your sentencing.

I want from you and from the New York justice to take another look as to Mokhtar Haouari case. Sentencing should set when the evidence at the hand is absolute, and look if the evidence is in doubt it would be preferable to rescind the decision. I go to different subject.

I will move to the case about Abu Doha and Samir Mohamed. Previously the government attorney called me, Bruce, about to testify in the case of Abu Doha and Samir Mohamed in front of a jury in New York. At the beginning I refused, and then I accept because I could not find an alternative to that. And also in order to appear at the earliest possible time in the court for my sentencing.

The later reason will affect the case of Abu Doha and Samir Mohammed and cause their cases to be dismissed in America.

When I appeared in front of the jury in New York I retrieved almost all the statements that I made in the past as to Abu Doha and Samir Mohamed. I indicate in my earlier statement because I did not know what I was saying.

Ressam concluded by stating that he had nothing to say about his trial and asked the district court to "[s]entence me to life in prison or anything you wish. I will have no objection to your sentence."

In its argument, the government retracted the position stated in the sentencing memorandum filed before the hearing, which recommended a sentence of 45 years. The government instead recommended that Ressam serve a term of life

imprisonment, emphasizing the seriousness of the crimes, his further recantation and attempts to distance himself from his earlier cooperation, and the need to protect the public from further crimes.

With regard to the seriousness of the crimes, the government in its sentencing memorandum urged the district court to consider that "all of the crimes of which Ressam was charged and convicted were directed at achieving his goal of placing a bomb at [LAX]." The government underscored the serious treatment given to crimes of terrorism under the Sentencing Guidelines. It quoted *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003), which noted:

> Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time.

Along similar lines, the government also argued:

> Ressam's arrest on December 14, 1999, was not the result of a sudden lapse of judgment. It was the culmination of years of planning and work, all aimed at causing as much harm to the United States as he could possibly inflict. Following his conviction in April 2001, Ressam claimed that after he observed the fairness with which the Court treated him throughout the trial, he had a change of heart and that he was "firmly against" terrorist operations in America and around the world.

> Ressam's change of heart was short-lived. Ressam has provided no indication that he has repudiated the goals of terrorists to inflict harm on the United

States. His decision to end cooperation raises the specter that he continues to pose a real and serious threat to the United States. Ressam's more recent decision to affirmatively help identified terrorists escape responsibility for their actions raises even more serious concerns. At this point in time, this Court [must] address the most fundamental question: at what age will Ressam no longer pose a threat to the people of the United States.

The government acknowledged that Ressam's cooperation, while it lasted, had been useful, but only to a degree. It emphasized the termination of Ressam's cooperation and observed that much of the value had been undermined or entirely lost as a result of his affirmative recantations subsequent to the 2005 sentencing hearings. It summarized the value of Ressam's cooperation generally as

> providing testimony in the prosecutions of individuals charged before he began his cooperation (such as the testimony he provided during the trial of Mokhtar Haouari), providing information about explosive devices that was very helpful in determining the nature of the device found in Richard Reid's shoe and providing information that corroborated the information already known by the United States and foreign governments.
>
> To be sure, the information about trade craft, terrorism organizations, and training camps that Ressam provided was in an unclassified form. Thus this information could be broadly disseminated to law enforcement officers both in the United States and abroad in order to broaden their base of knowledge. While this was of significant value, the information provided was not unique to Ressam.
>
> Perhaps his most valuable information—that leading to the charges against Doha and Mohamed—

cannot be credited. Ressam undermined that value when he chose to end his cooperation leading to the dismissal of these charges. . . . [H]e has also undermined his other cooperation by recanting earlier statements.

The government stated that Ressam's recantation of his prior statements regarding his terrorist training and the activities of other terrorists, and his decision to cease cooperating, forced the government to dismiss criminal charges against Doha and Mohamed. The government noted that as a high-ranking al-Qaeda member with close ties to Osama Bin Laden, Doha was one of the most dangerous terrorists ever charged by the United States. After the dismissal of the charges against him, Doha was released from custody and left the United States.

On the subject of Ressam's cooperation, the government argued that it would not have entered into the cooperation agreement with Ressam if it had known what was going to happen. It argued that "[a]ny benefit he provided initially has been substantially outweighed by his reversal, and [he] now attempts to use his position as a cooperating defendant to help his fellow terrorists."

Regarding the need to protect the public, the government explained that Ressam would still be relatively young upon release from prison if he were given a sentence similar to the one originally imposed by the district court in 2005:

The Court's July 2005 sentence, if reimposed, would mean that this defendant would be released in ten years, he would be out of jail in 2018. He would be 51 years of age. Think about the defendant's life prior to the arrest in this case, his fanatical commitment to jihad, his single-minded pursuit to attack the United States. Think about his recent decisions to help Abu Doha, Samir Mohamed, his most recent

decision to affirmatively help Hassan Zemiri and Adil Charkaoui, and as of today his attempt to withdraw even his cooperation in the trial against Haouari.

The government urged the district court to "send the defendant away for a long enough period of time so there is no chance he will ever target innocent victims again."

After hearing from the parties, the district court again sentenced Ressam to 22 years in prison. The court's explanation, in full, was as follows:

> The Ninth Circuit has made clear that the Sentencing Guidelines are only one factor to be considered among those factors set forth in 18 U.S.C. Section 3553(a), in determining an appropriate sentence. I may not presume that the Guidelines range is reasonable. Nor should the Guidelines factor be given more or less weight than any other factor. Accordingly, I have also considered the other Section 3553 factors in arriving at the sentence I am imposing today.

> On the one hand I recognize the need for the sentence imposed to reflect the seriousness of the offenses Mr. Ressam has committed, to provide just punishment for those offenses, and to promote respect for the law. Mr. Ressam's crimes, if carried to their intended conclusion, would have resulted in the deaths and injuries of hundreds of innocent people and instilled fear across the country and even the world. Fortunately, Mr. Ressam's arrest prevented such an outcome. Because of the work of an attentive Port Angeles Customs Inspector, Mr. Ressam's crimes did not lead to loss of life or limb, nor destruction of property. Nevertheless, the seriousness and heinousness of the act of terrorism Mr. Res-

sam was carrying out at the time of his arrest cannot be understated.

On the other hand, I recognize Mr. Ressam's extensive and valuable cooperation in the fight against terrorism during the first two years after his trial. Although it ended unwisely and prematurely, Mr. Ressam's cooperation, unique in its breadth and scope, weighed heavily in my initial sentencing decision and its import has not changed in my analysis today. The government's 5K1.1 motion filed in February 2003 requested a downward departure from the Sentencing Guidelines based on Mr. Ressam's substantial assistance in the case of *United States versus Mokhtar Haouari*, a matter prosecuted in the Southern District of New York in the summer of 2001 and resulting in the conviction of Mr. Haouari.

Mr. Haouari was sentenced in 2002 to a term of 24 years' imprisonment. Mr. Ressam's testimony at the trial connected Mr. Haouari to the terrorist plot, of which Mr. Ressam himself was a part, to bomb the Los Angeles International Airport on New Year's Day 2000. In addition to his substantial cooperation in that case Mr. Ressam also testified before a German tribunal on behalf of the German government in the trial against Mounir el Motassadeq. I am butchering that name. I will spell it. It is M-O-U-N-I-R, E-L M-O-T-A-S-S-A-D-E-Q. In December 2002, which resulted in a conviction and sentence of 15 years.

The Court recognizes that Mr. Ressam's later decision to end his cooperation resulted in the dismissal of two pending prosecutions and the retraction of certain of his statements against two other terrorist suspects. However, Mr. Ressam's cooperation, while it lasted, provided the United States gov-

ernment and the governments of Great Britain, Spain, Italy, Germany, France and Canada extensive intelligence that proved to be invaluable in the fight against international terrorism. The defendant's sentencing memorandum submitted before the July 2005 sentencing hearing summarizes the far-reaching impact of Mr. Ressam's cooperation on the investigations and prosecutions of terrorist activities in this country and abroad.

Downplaying the cooperation that Mr. Ressam provided the government would diminish the likelihood of future cooperation by other apprehended terrorists. Further, doing so would not be fair to Mr. Ressam. After his trial he told me that the fairness of his trial was not what he expected, given what he had done. The fair treatment that Mr. Ressam received in his public trial was a major influence on his decision to break with his past and cooperate, a choice that undoubtedly saved innocent lives. In making that decision, he put his own life at risk. In addition, he has spent years in solitary confinement in a country far from his family and loved ones and will, by any measure, be sacrificing a large portion of his life to pay for his crimes.

I believe that the sentence I am imposing today will serve as a deterrent while promoting respect for the American rule of law by demonstrating the fairness of our federal court system rather than merely its punitiveness.

In addition, I have taken into account Mr. Ressam's history and characteristics. Reading Mr. Hillier's 2005 sentencing memorandum and the report from Dr. Grassian leads me to the conclusion that Mr. Ressam's life history and personal characteristics support favorable sentencing consideration. His

life and reasons for involvement in his crime do not support a conclusion that he is a good person, but it also deserves consideration. Mr. Hillier describes a quiet, solitary and devout man whose true character is manifest in his decision to cooperate. Through the course of the trial and immediately thereafter, Mr. Ressam wrestled with what he had done and why. As Mr. Hillier put it, Mr. Ressam determined that violent action brought shame to the concerns he was trying to promote, and that as a result what he was doing was harmful in all respects.

I have also taken into account the nature of Mr. Ressam's crimes required that he be held in solitary confinement for upwards of four years, if not for the likely entirety of his sentence. This isolation is exacerbated by the fact that he does not speak English and has no opportunity for visits by friends and family abroad. These harsh conditions of confinement necessarily set Mr. Ressam's situation apart from that of the typical criminal sentencing. I am also persuaded that Mr. Ressam's mental health deteriorated somewhat from the isolation of his confinement and the repetitive, intensive questioning to which he submitted, and that these conditions contributed to the early termination of his cooperation.

Moreover, I have considered the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. Mr. Haouari, for example, was sentenced to 24 years for his involvement in the same plot. Abdel Meskini, also indicted based on his connection to Mr. Ressam and prosecuted in the Southern District of New York, pled guilty and received a sentence of six years.

Finally, I have spent a good deal of time since Mr. Ressam's previous sentencing reviewing other

terrorism-related prosecutions around the country. According to a recent study of 124 defendants sentenced in terrorism trials in American federal courts since September 12, 2001 to December 31, 2007, a paper that was prepared by two former federal prosecutors, the average term of imprisonment was a little over eight years. These cases involved different sets of facts and did not influence my decision in determining an appropriate sentence in this case. However, I mention a few of them here to provide a backdrop against which Mr. Ressam's conviction and sentence may be viewed. For example, John Walker Lindh was captured during the 2001 invasion of Afghanistan while he was fighting in the Taliban army. Mr. Lindh was trained by al Qaeda and fought on the front lines in Afghanistan against the Northern Alliance. The notoriety of his case stemmed in part from his involvement in a violent uprising in Afghanistan in which a CIA agent was killed. He was later brought to the United States and indicted on ten charges in the Eastern District of Virginia. Ultimately, he pled guilty to supplying services to the Taliban army and carrying an explosive during the commission of a felony. He received a sentence of 20 years.

In 2002, Imran Mandhai pled guilty in the Southern District of Florida to conspiring to destroy electrical power stations by means of fire and explosives in retaliation for the US government's support of Israel and in an effort to secure the release of Muslim prisoners. After numerous sentencing appeals Mr. Mandhai received a sentence of 14 years.

In 2005, after being held for three years as an enemy combatant, Jose Padilla was indicted in the Southern District of Florida on federal terrorism charges. After a four-month jury trial, he was con-

victed of conspiracy to murder, kidnap and maim, and conspiracy to provide material support to terrorists. The conviction resulted in a sentencing [G]uideline[s] range of 360 months to life. Mr. Padilla received a sentence of 17 years and four months. In imposing the sentence, the Court considered the fact that Mr. Padilla had been held in solitary confinement under harsh conditions for a significant period of time and would likely be held under similar conditions in the future. Mr. Padilla's co-conspirators, Mr. Hassoun and Mr. Jayyousi, received sentences of 15 years and eight months and 12 years and eight months, respectively.

I note that none of the defendants in these cases cooperated as extensively, providing as much valuable information to the fight against terrorism as Mr. Ressam did. As I emphasized earlier, Mr. Ressam's cooperation provided authorities in this country and abroad with an unprecedented view of the inner workings of al Qaeda that almost certainly thwarted future attacks. In fact, it was the extent of Mr. Ressam's cooperation in the conviction of one of his co-conspirators that resulted in the government filing a 5K1.1 motion, specifically requesting that Mr. Ressam be sentenced below the applicable [G]uideline[s] range.

Therefore, based on all the factors listed in 18 USC Section 3553, I hereby reimpose a sentence of 22 years and a period of supervised release of five years subject to the standard conditions, together with those additional conditions set forth in the pre-sentence report. I recognize that the sentence I am imposing reflects a significant downward deviation from the advisory [G]uideline[s] range. However, I believe the factors I have examined on the record are

sufficiently compelling to support the degree of the variance.

After the sentencing, the government moved to withdraw its § 5K1.1 motion, relying on language in the agreement that gave the government the right to withdraw the motion "[s]hould it be determined by the government that Mr. Ressam has violated any provision of this agreement." The district court denied the motion as untimely.

After advising Ressam of his right to appeal the sentence, the district court offered some concluding remarks:

> As I said at Mr. Ressam's previous sentencing in 2005, determining an appropriate sentence in this case is a decision I struggled with more than any other sentencing decision I have made in my 27 years on the bench. In the time since Mr. Ressam's first sentencing, however, I have come to feel even more confident that the sentence I originally imposed was the correct one. Mr. Ressam's trial and the outstanding professionalism of both the prosecution and defense throughout this case illuminate how our country can deal with threats to our national security without denying the accused constitutional fundamental protections within the framework of our federal court system.

> As our nation prepares for a new chapter of American history with a new president, it is my hope that those with the power to affect the way terrorism trials are conducted in this country will look favorably upon this case and share my view.

The government appealed the sentence imposed upon Ressam. A three-judge panel of this court, by a 2-1 majority, vacated the sentence and remanded for resentencing before a different district judge. *United States v. Ressam*, 593 F.3d

1095 (9th Cir.), *amended by* 629 F.3d 793 (9th Cir. 2010).[6] We granted Ressam's petition for rehearing en banc. *United States v. Ressam*, 653 F.3d 963 (9th Cir. 2011).

## II.   The Government's Appeal

Ordinarily, when a sentence is appealed, "we first consider whether the district court committed significant procedural error, then we consider the substantive reasonableness of the sentence." *Carty*, 520 F.3d at 993. In this appeal, however, the government has expressly disclaimed any procedural challenge to the sentence imposed by the district court. In its opening brief, at 36, the government described the usual two-step process but made clear that it raised only a substantive challenge in this case: "The Court must first determine whether the district court committed significant procedural error, a claim not raised in this appeal. The Court must then consider whether the sentence is substantively reasonable, the issue raised here." (Citation omitted.) That stance was reiterated in the government's reply brief, at 5: "A sentence is reviewed first for procedural error, although none is alleged here." (Citation omitted.) As described in the opening brief, "[t]he sole issue presented in this case is whether the sentence imposed on Ahmed Ressam is substantively unreasonable in light of the facts of this case and the factors set forth in 18 U.S.C. § 3553(a)," the statute that specifies the factors to be considered in imposing a sentence. Government counsel repeated the one-issue limitation at oral argument. As the government has decided to focus solely on the substantive reasonableness of the sentence, we elect to do the same.[7]

---

[6]Parts of this opinion, particularly large portions of the factual background, are drawn directly from the panel opinion authored by Judge Arthur Alarcón. His contribution is appreciated.

[7]We express no view on the question whether we could properly, on appellate review, vacate a sentence because of procedural errors even when the government does not argue procedural error and limits its argument to substantive unreasonableness, nor do we comment on the standard of review to be applied in such a situation.

### III.   Standard of Review

As noted at the outset of this opinion, we review the substantive reasonableness of a criminal sentence under what the Supreme Court has described as "the familiar abuse-of-discretion standard of review." *Gall*, 552 U.S. at 46. That it might be familiar does not mean that it is always clear or simple to apply.

In general terms we have held that "[a] district court abuses its discretion when it makes an error of law, when it rests its decision on clearly erroneous findings of fact, or when we are left with a definite and firm conviction that the district court committed a clear error of judgment." *United States v. Hinkson*, 585 F.3d 1247, 1260 (9th Cir. 2009) (en banc) (quoting *United States v. 4.85 Acres of Land, More or Less, Situated in Lincoln County, Mont.*, 546 F.3d 613, 617 (9th Cir.2008)), *cert. denied*, 131 S.Ct. 2096 (2011).[8]

In the sentencing context, the abuse of discretion standard is intended to chart a course between two extremes. It is clear that we are to afford significant deference to a district court's sentencing decision. As stated in *Carty*, "we may not reverse just because we think a different sentence is appropriate." 520 F.3d at 993. The Supreme Court explained this principle in *Gall*:

> Practical considerations also underlie this legal principle. The sentencing judge is in a superior position to find facts and judge their import under

---

[8]In *Hinkson*, we adopted a two-part objective test to define in more precise terms what is required to support a conclusion that there was an abuse of discretion. That test "requires us first to consider whether the district court identified the correct legal standard for decision of the issue before it. Second, the test then requires us to determine whether the district court's findings of fact, and its application of those findings of fact to the correct legal standard, were illogical, implausible, or without support in inferences that may be drawn from facts in the record." *Id.* at 1251.

§ 3553(a) in the individual case. The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record. The sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the Commission or the appeals court. Moreover, [d]istrict courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines sentences than appellate courts do.

552 U.S. at 51-52 (internal quotation marks and citations omitted).

At the same time, our deference to the district court is not total. When it introduced the advisory Guidelines system in *United States v. Booker*, 543 U.S. 220 (2005), the Court made clear that appellate review of a sentence imposed by the district court was not eliminated. Rather, a sentence is subject to review by the courts of appeals for "reasonableness." *Id*. at 261-62.

This is, we believe, where the dissenting opinion goes astray. It appears to our dissenting colleagues to be enough that the district court said that it considered the factors set forth in 18 U.S.C. § 3553(a) and provided some explanation of its reasoning. Practically speaking, the dissent would limit its review of a sentence imposed by a district court to procedural regularity. The dissent characterizes our conclusion that the district court abused its discretion as a simple disagreement that amounts to an improper re-weighing by this court of the relevant factors and asserts, repeatedly, that our decision violates the Supreme Court's directions in *Gall*. *See*, *e.g.*, Dissenting op. at 4731. The dissent thus emphasizes "how scrupulously the district court followed § 3553(a) in weighing each of its factors." *Id*. at 4735. But *Gall* explicitly confirmed the responsibility of the court of appeals to review not only

the process by which the sentence was imposed but also the substance of the sentence: "Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Gall*, 552 U.S. at 51; *see Carty*, 520 F.3d at 993. That the district court followed the proper procedure in imposing the sentence does not end our review.

The abuse of discretion standard is deferential, but it does not mean anything goes. The Court held in *Gall* that the district court had not abused its discretion in that case, but it did not hold that discretion could never be abused. The dissenting opinion appears prepared to affirm the sentence imposed by the district court because it was imposed in a procedurally proper manner, but, as other courts have cautioned, appellate review for substantive reasonableness should not be such a "rubber stamp." *See United States v. Pinson*, 542 F.3d 822, 836 (10th Cir. 2008) ("[U]ntil the Supreme Court tells us otherwise[,] appellate review continues to have an important role to play and must not be regarded as a rubber stamp."); *United States v. Rattoballi*, 452 F.3d 127, 132 (2d Cir. 2006) ("Our own review for reasonableness, though deferential, will not equate to a 'rubber stamp.' "); *United States v. Moreland*, 437 F.3d 424, 433 (4th Cir. 2006) ("Although [a reasonableness] standard clearly requires us to afford a degree of deference to the sentencing decisions of the district court, 'reasonableness' is not a code-word for 'rubber stamp.' ").

We have, on rare occasion, vacated a sentence on the ground that it was substantively unreasonable. In *United States v. Amezcua-Vasquez*, 567 F.3d 1050 (9th Cir. 2009), for instance, we vacated a 52-month sentence imposed for a conviction of an alien for attempting to reenter the United States unlawfully. The sentence imposed by the district court fell within the applicable Guidelines range, but we concluded that it was substantively unreasonable, nonetheless, largely because it was unduly influenced by a prior conviction that

was more than twenty years old. Recognizing that a simple disagreement with the district court's sentencing decision was not enough under the abuse of discretion standard to support a conclusion that the sentence was substantively unreasonable, we held that "we may reverse if, upon reviewing the record, we have a definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon weighing the relevant factors." *Id.* at 1055.

We adhere to the formulation announced in *Amezcua-Vasquez*. That requirement for "a definite and firm conviction that the district court committed a clear error of judgment" is consistent with the general description of the abuse of discretion standard we recently articulated in *Hinkson*, as quoted above at 4702.

As the Second Circuit has explained, the substantive reasonableness standard has much in common with other deferential standards applied in other contexts, such as the "manifest-injustice" and "shocks-the-conscience" standards:

> First, they are deferential to district courts and provide relief only in the proverbial "rare case." Second, they are highly contextual and do not permit easy repetition in successive cases. Third, they are dependent on the informed intuition of the appellate panel that applies these standards. In sum, these standards provide a backstop for those few cases that, although procedurally correct, would nonetheless damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law. Of course, an "intuitive" review cannot be an invitation to mischief by tinkering with any sentence that appellate judges simply do not like. Responsible appellate review of sentences necessarily places great trust in sentencing courts while still recognizing the responsibility to examine the actual sentence

itself (quite apart from the procedures employed in arriving at the sentence).

*United States v. Rigas*, 583 F.3d 108, 123 (2d Cir. 2009) (citations and footnote omitted), *cert. denied* 131 S. Ct. 140 (2010).

In sum, our review of the substantive reasonableness of a sentence is deferential and will provide relief only in rare cases. Such appellate review necessarily turns on the particulars of each case.[9]

## IV.    Ressam's Sentence

Recognizing the deference owed to the district court, it is our conclusion that the sentence imposed by the district court in this case was substantively unreasonable. We reach that conclusion after examining the "totality of circumstances," as directed by *Gall*, 552 U.S. at 50, and *Carty*, 520 F.3d at 993.

### A.    *Section 3553(a) Factors and the Guidelines Range*

To put the sentence imposed on Ressam in context, we

---

[9]*Rigas* contains another useful observation regarding the appropriate standard of review that we believe is worth noting and with which we agree:

> To say that a sentence is "substantively unreasonable" is not to say that "no reasonable person" would have imposed such a sentence. We may generally assume that federal judges are "reasonable" people in the commonsense definition of the term. Nonetheless, even reasonable individuals can make unreasonable decisions on occasion. The Supreme Court recognizes this and has charged the Courts of Appeals with reviewing the substance of sentences for reasonableness, and we cannot employ a definition of "substantive unreasonableness" that would render the required review a dead letter.

583 F.3d at 123 n. 5. The law imposes a "no reasonable person" standard in other contexts, but it does not apply here.

begin with the factors to be considered by the district court in sentencing, as set forth in 18 U.S.C. § 3553(a), and the now-advisory Sentencing Guidelines range.

In our en banc decision in *Carty*, we outlined in bullet points our understanding of basic sentencing principles drawn from the relevant Supreme Court precedents regarding sentencing, notably *Booker*, *Gall*, *Rita v. United States*, 551 U.S. 338 (2007), *and Kimbrough v. United States*, 552 U.S. 85 (2007). Two of those bullet points described the district court's responsibility with explicit reference to § 3553(a):

> • The overarching statutory charge for a district court is to "impose a sentence sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. 18 U.S.C. § 3553(a) and (a)(2).
>
> . . . .
>
> • The district court should then consider the § 3553(a) factors to decide if they support the sentence suggested by the parties, i.e., it should consider the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed; the kinds of sentences available; the kinds of sentence and the sentencing range established in the Guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims. 18 U.S.C. § 3553(a)(1)-(7); *Gall*, 552 U.S. at 50 n.6.

*Carty*, 520 F.3d at 991.

**[1]** "A substantively reasonable sentence is one that is 'sufficient, but not greater than necessary' to accomplish § 3553(a)(2)'s sentencing goals." *United States v. Crowe*, 563 F.3d 969, 977 n.16 (9th Cir. 2009) (quoting 18 U.S.C. § 3553(a)). "The touchstone of 'reasonableness' is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009) (en banc) (internal quotation marks and alterations omitted). "In determining substantive reasonableness, we are to consider the totality of the circumstances, including the degree of variance for a sentence imposed outside the Guidelines range." *Carty*, 520 F.3d at 993.

**[2]** In addition to the requirement to consider and apply the § 3553(a) factors, noted above, it is also well established that the district court must begin the sentencing process "by determining the applicable Guidelines range." *Carty*, 520 F.3d at 991. In reaching its sentencing decision, the "district court[ ] must . . . remain cognizant of [the Guidelines] throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6; *see Carty*, 520 F.3d at 991 (the Guidelines "are to be kept in mind throughout the [sentencing] process" (citing *Gall*)).

When a sentencing "judge 'decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.' " *Carty*, 520 F.3d at 991 (quoting *Gall*, 552 U.S. at 50). As the Court explained in *Gall*, "a major departure should be supported by a more significant justification than a minor one." 552 U.S. at 50.

**[3]** The Guidelines range for the term of imprisonment for Ressam, as calculated by the district court and not challenged by either party, was 65 years to life imprisonment. The district

court did not express any policy disagreements with the Guidelines and their treatment of Ressam's crimes, as it could have under *Kimbrough*.

**[4]** Ressam's sentence of 22 years thus represented a major departure. We acknowledge that 22 years is not a trivial period of time, but that sentence still amounted to a reduction of 43 years, or two-thirds, from the low end of the Guidelines range. Moreover, 10 of Ressam's 22 years represent a mandatory, consecutive sentence for violation of 18 U.S.C. § 844(h)(2). For his other crimes of conviction, the total applicable Guidelines range was 55 years to life, but he received only 12 more years—a downward departure of more than three-fourths as to the counts on which the sentencing judge had discretion.

**[5]** The Supreme Court has explicitly rejected "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Gall*, 552 U.S. at 47. It has made clear, nonetheless, that we are to consider the "extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 50. It is in that light that we must assess the district court's consideration of the § 3553(a) factors.

### B.    Nature and Circumstances of the Offense

**[6]** The first factor identified in § 3553(a) to be considered in sentencing is "the nature and circumstances of the offense." The crimes that Ressam sought to commit were horrific. The most important reason for our conclusion that the sentence imposed by the district court was substantively unreasonable is that the sentence did not properly account for those crimes.

Had Ressam succeeded in his plot to blow up LAX, it would have resulted in many deaths and injuries, substantial property damage, and enormous disruption to the nation's

transportation system. The district court acknowledged that "Mr. Ressam's crimes, if carried to their intended conclusion, would have resulted in the deaths and injuries of hundreds of innocent people and instilled fear across the country and even the world." Many common criminals have been sentenced to much longer terms for offenses with much less serious consequences.

**[7]** That Ressam's crimes were in furtherance of a terrorist attack compounded the severity of the crimes. Had Ressam succeeded, "LAX" may well have entered our vocabulary as a term analogous to "the Oklahoma City bombing" or "9/11." His clear intent was to intimidate this nation and the world, and he sought to influence world events and the conduct of the United States government through that intimidation. The Sentencing Guidelines specifically provide for a substantial upward adjustment for federal crimes of terrorism. U.S.S.G. § 3A1.4. The sentence imposed by the district court effectively negated that adjustment.

### C.   Protection of the Public

**[8]** Section 3553(a)(2)(C) provides that, in imposing a sentence, the district court should consider the need "to protect the public from further crimes." Concern for the threat that Ressam could pose to our nation is particularly powerful because under the district court's sentence, he would be only 51 years old upon his release from prison. Most people are sufficiently active and capable at age 51 to do considerable damage, if they are so inclined, and Ressam demonstrated strongly held beliefs and a willingness to attack American interests. If and when he is released, he could try again to blow up LAX or to launch some other attack. To be sure, his release would come only after many years of imprisonment, but Ressam would likely be capable of organizing another attack at that point. Ressam's release at age 51 could therefore pose another danger that the district court did not fully take into proper account.

We share the concern expressed by the Eleventh Circuit in its recent decision overturning the sentence of Jose Padilla. *United States v. Jayyousi*, 657 F.3d 1085, 1117-19 (11th Cir. 2011). Among the reasons cited by that court in holding the sentence of 17 years and 4 months to be substantively unreasonable was its conclusion that the sentence imposed failed to protect the public from further crimes. *Id.* at 1117. The court pointed out that

> [a]lthough recidivism ordinarily decreases with age, we have rejected this reasoning as a basis for a sentencing departure for certain classes of criminals, namely sex offenders. We also reject this reasoning here. "Terrorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." Padilla poses a heightened risk of future dangerousness due to his al-Qaeda training. He is far more sophisticated than an individual convicted of an ordinary street crime.

*Id.* (citations and brackets omitted) (quoting *Meskini*, 319 F.3d at 92); *see also United States v. Abu Ali*, 528 F.3d 210, 258-65 (4th Cir. 2008) (holding 30-year sentence to be substantively unreasonable after conviction of conspiracy to inflict mass civilian casualties and assassination of high public officials in the United States, because of recidivism concerns and impermissible comparisons to other terrorism-related cases), *resentencing aff'd*, 410 F. App'x 673, 682 (4th Cir. 2011) (per curiam) (affirming the district court's imposition of a life sentence). We follow that reasoning here.

In addition, even if Ressam were incapacitated by the time of his release, the attention to be generated by his release and likely return to Algeria could inspire others to try to complete his mission or to embark on a different attack. The release of the Lockerbie bomber, Abdelbaset al-Megrahi, from prison in Scotland because of ill health in 2009 and his subsequent

return to Libya produced an uproar because of precisely that fear. Although Megrahi may have been in no condition to launch a new attack himself, there was understandable concern that his presence in Libya could inspire others. Under the sentence imposed by the district court, Ressam's release date, currently projected by the Bureau of Prisons to be July 15, 2019, is not so many years away. His release at that time would pose a significant danger that the district court failed to take into account.

## D.   Ressam's Cooperation and Character

[9] Section 3553(a)(1) identifies "the history and characteristics of the defendant" as one of the factors to consider in imposing a sentence. That factor may include the defendant's cooperation with authorities.[10] The only justifications for the district court's substantial downward departure in sentencing Ressam were his cooperation and, more broadly, his history and personal characteristics, as expressed in the court's explanation for the sentence. It was appropriate for the district court to consider those factors.

When imposing a sentence that is well below the Guidelines range because of the assistance provided by a defendant, however, there must be some indication that the extent of departure is justified. *See United States v. Haack*, 403 F.3d

---

[10]A defendant's cooperation may be taken into account in calculating a Guidelines sentencing range, after granting a motion for a departure under § 5K1.1 of the Guidelines. Alternatively, cooperation may be included as part of consideration of § 3553(a) factors after a Guidelines sentencing range is calculated. *See e.g.*, *United States v. Zolp*, 479 F.3d 715, 721 (9th Cir. 2007) ("the district court did not err by considering [defendant's] cooperation as part of its analysis under 18 U.S.C. § 3553(a) rather than as part of its advisory guidelines calculation"). This is because " 'the scheme of downward and upward 'departures' [is treated] as essentially replaced by the requirement that judges impose a 'reasonable" sentence.' " *Id*. at 722 (quoting *United States v. Mohamed*, 459 F.3d 979, 986 (9th Cir. 2006)).

997 (8th Cir. 2005) (examining the reasonableness of the sentence against the five factors outlined in U.S.S.G. § 5K1.1 and concluding that the imposition of a 78-month sentence was not justified where the Guidelines range was 180 months and the assistance the defendant provided consisted of information regarding others who were either already under indictment or were suspects).

There is no doubt that Ressam cooperated with the federal government and with governments of some other allied nations, for a period of time. But he did not begin to cooperate until after he was convicted by the jury and faced life in prison. The timing of Ressam's cooperation suggests that it was prompted by his desire to make the best of a bad situation, not some altruistic motive, sincere regret, or deeper good nature.

Moreover, Ressam stopped cooperating. This made it impossible for the government to proceed with certain prosecutions and led to the release of certain suspected terrorists. At the time his sentence was originally imposed in 2005, there remained some hope that Ressam might live up to the cooperation agreement that he had signed. That hope was extinguished by the time of Ressam's resentencing in 2008. He had, in the interim, affirmatively repudiated his agreement to cooperate, recanted his testimony, and done everything he could to diminish the assistance he had already provided.

**[10]** Yet the district court imposed exactly the same sentence in 2008 as it had in 2005, failing to account for the dramatic change in circumstances. The court stated in 2008 that "Ressam's cooperation, unique in its breadth and scope, weighed heavily in my initial sentencing decision and its import has not changed in my analysis today." Treated as a factual finding, the district court's assessment of Ressam's cooperation was clearly erroneous.

The district court significantly overvalued the cooperation provided by Ressam during the time that he provided assis-

tance. "The Guidelines afford the sentencing judge wide lati-
tude in evaluating the 'significance and usefulness of the
defendant's assistance,' but direct courts to give 'substantial
weight . . . to the government's evaluation' of that assistance."
*United States v. Awad*, 371 F.3d 583, 586-87 (9th Cir. 2004)
(citing U.S.S.G. § 5K1.1(a)(1) & cmt. background) (alter-
ations in original; some internal quotation marks omitted); *see
also* U.S.S.G. § 5K1.1 cmt. n.3 (providing that "[s]ubstantial
weight should be given to the government's evaluation of the
extent of the defendant's assistance, particularly where the
extent and value of the assistance are difficult to ascertain").

The district court failed to give "substantial weight" to the
government's evaluation of the extent of the defendant's
assistance. Instead, the court credited Ressam's assessment of
the value of his own cooperation, expressly relying on the
"defendant's sentencing memorandum submitted before the
July 2005 sentencing hearing" as the basis for its assessment
of the "far-reaching impact of Mr. Ressam's cooperation on
the investigations and prosecutions of terrorist activities in
this country and abroad." That consideration failed to take
into account the effect of Ressam's subsequent recantations.

More broadly, Ressam and his counsel were in no position
to evaluate the effects of and benefits from his cooperation.
Notably, they could not know what the government already
knew or would have been able to learn from other sources.
That is why the Guidelines expressly require district courts to
give substantial weight to the evaluation by the government.
It is the government that is in the position to know the effects
of defendants' provided information, and that is especially
true with information of the kind provided by Ressam.

Much of the information Ressam provided was not unique
to him, according to the government. Moreover, as the gov-
ernment argued, Ressam's "most valuable information—that
leading to the charges against Doha and Mohamed—cannot
be credited [because] Ressam undermined that value when he

chose to end his cooperation leading to the dismissal of these charges."

Similarly, the district court significantly understated the impact of Ressam's repudiation of the cooperation agreement and recantations of his prior statements. The district court acknowledged "that Mr. Ressam's later decision to end his cooperation resulted in the dismissal of two pending prosecutions and the retraction of certain of his statements against two other terrorist suspects." But the district court failed to take into proper account the effect of Ressam's early cessation of cooperation or recantations and failed to adjust the sentence in response.

The district court expressed concern that "[d]ownplaying the cooperation that Mr. Ressam provided the government would diminish the likelihood of future cooperation by other apprehended terrorists." That assessment appears to us woefully misguided and, if intended as a finding of fact, clearly erroneous.

Ressam voluntarily, and with advice from counsel, entered into an agreement with the government in which he promised full cooperation. Under the terms of that agreement, both parties committed to seeking a sentence of not less than 27 years. Ressam may have believed, with some justification, that he could later ask the government to agree to reduce the minimum term, but the agreement he entered into set 27 years as a floor for the term of imprisonment that either party would recommend to the court.

But Ressam violated the agreement. Most importantly, he withheld his cooperation. He compounded the potential ill effects of his withdrawal by affirmatively disavowing the information he had already provided. He then argued for a sentence substantially lower than the 27-year term which the cooperation agreement provided would be the minimum that

either side would recommend, thus breaching the agreement in yet another way.

After all that, the district court gave him a sentence well below the 27-year minimum that was premised on full cooperation. The far more likely inference to be drawn from the court's sentencing is that a defendant might be able to repudiate a cooperation agreement and recant previous testimony with no ill effects. Indeed, Ressam appeared to come out ahead.

It is hard to perceive what reason there is to provide any reward to a defendant who terminates his cooperation in breach of the agreement into which he entered and who affirmatively acts, as Ressam did, to undermine the value of statements that he had already provided. Rewarding such conduct sends precisely the wrong message to other offenders.

**[11]** We also find unreasonable and clearly erroneous the district court's finding that "Mr. Ressam's life history and personal characteristics support favorable sentencing consideration," in view of the substantial evidence, including the information contained in the Presentence Report, that Ressam had for many years violated the laws of many nations and led a life dedicated to terrorist causes. The district court credited Dr. Grassian's favorable report and Ressam's own characterization in his 2005 sentencing memorandum that "by naming and identifying scores of former associates, Mr. Ressam not only has imperiled his life, but also has decisively walked away from the illegality that led to his arrest." But Ressam's subsequent recantations squarely undermined that assessment.

In finding that Ressam was "a quiet, solitary and devout man whose true character is manifest in his decision to cooperate," the district court simply did not come to grips with the many facts demonstrating the contrary. Even leaving aside his plan to blow up LAX, it cannot be overlooked that Ressam spent nearly a year attending three training camps for Islamic

terrorists in Afghanistan, conspired with other would-be terrorists, used forged documents and false identities on multiple occasions, had been deported from France as early as 1993, violated the immigration laws of the United States, France, and Canada, and planned to rob a bank to obtain funds to carry out his mission. In the course of robbing the bank, Ressam intended to throw a live hand grenade and run if necessary to get away. These facts and others directly refute the district court's finding that Ressam is "a quiet, solitary and devout man whose true character is manifest in his decision to cooperate."

Indeed, based on this record, if there was a period of aberrant behavior in Ressam's adult life, it was during the relatively brief time following his conviction when Ressam provided assistance to the government. His conduct before and after that limited period contradicts the district court's assessment of his character.

**[12]** Even if, in the end, it might be determined that Ressam should be given some credit for his cooperation and personal characteristics, that credit is not nearly strong enough to justify the substantial downward departure provided in the district court's 22-year sentence.

### E. The Need to Avoid Unwarranted Sentencing Disparities

**[13]** A factor the district court should consider in fashioning an appropriate sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The explanation given by the district court for the sentence imposed on Ressam referred to sentences imposed on his co-conspirators, Haouari and Meskini, and on others convicted for similar misconduct, John Walker Lindh, Imran Mandhai, and most significantly, Jose Padilla. The district court expressly prefaced its discussion of others con-

victed of similar misconduct with the caveat that "[t]hese cases involved different sets of facts and did not influence my decision in determining an appropriate sentence in this case," but the court nonetheless went on to describe the sentences at some length and compare each case to Ressam's. It is thus appropriate for us to do so as well. We conclude that those comparisons did not justify Ressam's sentence.

Ressam's co-conspirators presented very different circumstances. Haouari did not present a parallel case because Haourai did not participate in the plan to blow up LAX nearly to the extent that Ressam did. Haouari was convicted of conspiracy for providing material support to Ressam on the strength of evidence showing that Ressam had made several remarks to Haouari indicating that Ressam was engaged in "important" business in America that involved "fear and danger." *Haouari*, 2001 WL 1154714, at *2. Providing support to Ressam with the knowledge that Ressam was engaged in some kind of dangerous business in the United States was not the equivalent of planning out and taking several material steps toward the actual bombing of LAX. As for Meskini, while Ressam rejected a pre-trial plea offer and elected to put the government to its burden of proof, Meskini pled guilty to the charges in the indictment. *Meskini*, 319 F.3d at 91.

The sentences of Irham Mandhai, John Walker Lindh, and Jose Padilla, other sentences identified by the district court, did not offer appropriate comparisons, either. Like Meskini, Mandhai and Lindh pled guilty. *See United States v. Mandhai*, 375 F.3d 1243, 1245 (11th Cir. 2004) (noting that Mandhai pled guilty and received 11 years and 8 months); *United States v. Lindh*, 227 F. Supp. 2d 565, 566, 571-72 (E.D. Va. 2002) (sentencing Lindh, after he entered a plea of guilty, to 20 years, the statutory maximum on the counts charged).

**[14]** As noted above, the sentence of Jose Padilla was recently overturned by the Eleventh Circuit as substantively unreasonable, so that comparison is no longer available to

support the sentence imposed on Ressam by the district court. More importantly, the decision was based in substantial part on comparisons to sentences imposed in other terrorism cases drawn by the district court in sentencing Padilla that were held by the Eleventh Circuit to be "impermissible." *Jayyousi*, 657 F.3d at 1117. "In comparing Padilla to criminals like David Hicks, Yahya Goba, and Imran Mandhai who had either been convicted of less serious offenses, lacked extensive criminal histories, or had pleaded guilty, the district court erred." *Id.* at 1118. We agree and reject the comparison of Ressam's sentence to defendants who pleaded guilty or were convicted of much less serious offenses.

## F.  *Recommendations and Offers by the Government*

**[15]** It is for the same reason that we reject any comparison with the offer made by the government to Ressam, before trial, of 25 years in exchange for a guilty plea. Ressam argued at sentencing that the starting point to determine the appropriate downward departure for his cooperation should be that offer of 25 years, made at a time the government was uncertain of its ability to obtain a conviction. But Ressam rejected the offer, electing to require the government to prove its case. It did.

After the conviction, the government made different sentencing recommendations at different times. At the 2005 sentencing, the government recommended a sentence of 35 years. In 2008, the government's sentencing memorandum filed in advance of the sentencing hearing recommended 45 years. At the hearing itself, the government withdrew that position and recommended life imprisonment.

The district court did not cite any recommendation made by the government in explaining the sentence it imposed in either 2005 or 2008, and the government's recommendations were not binding on the district court in any event. Nonetheless, the pre-trial offer and the post-conviction recommendations have

been referred to frequently in the argument on appeal, and the dissenting opinion refers, at 4728, to the 35-year recommendation made by the government in 2005. Ressam pointed to them to suggest that the district court's sentence of 22 years was reasonable because it was within a reasonable range of what the government itself sought. The government responded that it should not be bound, and that we should not be persuaded, by recommendations it made when the relevant circumstances appeared different. That was certainly true for the pre-trial plea offer, as discussed above. It was also true for the recommendation made in 2005, when there remained hope that Ressam might resume cooperation.

**[16]** We do not need to comment on the comparisons to the government's recommendations in 2008 of 45 years and then of life imprisonment. The 22-year sentence imposed by the district court in 2008 is too far below both of the sentence recommendations by the government at that time to obtain any support from them.

## V.   The Dissenting Opinion

As noted above, at 4703-04, we believe that the dissenting opinion is mistaken primarily because it disregards our responsibility to review a sentence for substantive reasonableness. It offers little defense on the merits of the sentence imposed by the district court, perhaps in recognition that it is a difficult sentence to defend.

It is not true that the district court's sentence was based on "nothing that could be said to be 'illogical, implausible, or without support in the record.' " Dissenting op. at 4733 (citing *Hinkson*, 585 F.3d at 1251). All of those descriptions apply, as we have detailed over the last several pages. We highlight here just a few points of our disagreement with the dissenting opinion.

**[17]** The dissent complains that we failed to give sufficient regard to the district court's evaluation of Ressam's coopera-

tion and its termination. It contends that "the district court's assessment of the net value and the weight it assigned that value as a sentencing factor were matters within its discretion to decide." Dissenting op. at 4734. We agree, but the exercise of that discretion is subject to review, and we conclude that the district court abused its discretion. To begin with, the dissenting opinion fails to explain why Ressam should be given any credit for assistance after he breached the cooperation agreement, stopped providing assistance, and did everything he could to undermine the value of testimony and information he had previously provided, let alone why he received exactly the same credit he was previously given by the district court in 2005, prior to his repudiation. That behavior did not reflect personal history and characteristics that merited reward. More specifically, we conclude that the district court abused its discretion because it overvalued Ressam's cooperation and undervalued the impact of his later repudiation, for the reasons discussed above, at 4713-15. We do not suggest that "the district court must rubber-stamp the government's sentencing positions," Dissenting op. at 4735, but the district court must give " 'substantial weight . . . to the government's evaluation' of that assistance," *Awad*, 371 F.3d at 586-87 (citing U.S.S.G. § 5K1.1(a)(1) & cmt. background), and it failed to do so here.

The dissent takes issue with what it describes as our evaluation of Ressam's character. It argues that we were wrong in finding clearly erroneous the district court's description of Ressam as "quiet, solitary, and devout" and its conclusion that this history supported favorable sentencing consideration. It argues that the district court was, in that characterization, "accurately describing what the record showed about the defendant's life before his mid-twenties." Dissenting op. at 4739. But, as we described above, notably at 4716-17, the record demonstrates that Ressam for many years violated the laws of many nations and dedicated his life to terrorist causes. That history does not support favorable sentencing consideration. That Ressam may have been "quiet, solitary, and devout" in his younger years is beside the point.

Moreover, that a defendant may be "quiet" and "solitary" does not itself justify a lighter sentence. Loners are not necessarily law-abiding; some of the worst offenders have been "quiet" and "solitary." Besides, Ressam was not all that quiet and solitary. He conspired with others in his criminal activities, through which he sought to make a very large noise. To the extent that he acted alone in these crimes it was because the other members of his cell had immigration problems and could not get to Canada. That does not justify a lighter sentence. Nor is being "pious" necessarily a virtue. Ordinarily, religious faith is a positive influence, but Ressam's extreme and warped beliefs motivated him to wage war on this country and to try to kill innocent people. That does not justify a lighter sentence, either.

The dissent contends that our decision improperly treats terrorism differently from other offenses and "thus flies in the face of the Congressionally sanctioned structure of sentencing that applies to terrorism as well as all other kinds of federal criminal offenses." Dissenting op. at 4739. But it was the district court that treated these crimes differently by disregarding the established sentencing structure. The seriousness of Ressam's offense is taken into account in the criminal statutes and in the Sentencing Guidelines, but the district court paid essentially no attention to the advisory sentencing range, imposing a sentence 43 years, or two-thirds, below the low end of the range—exactly the same sentence that it had imposed in 2005 when it failed to calculate the Guidelines range.

The Supreme Court in *Gall* explicitly instructed us to consider, on appellate review, the "extent of the deviation [from the Guidelines range] and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 47. The justification provided by the district court is not nearly compelling enough to justify the degree of variance here.

## VI. Conclusion

**[18]** Because we conclude that the district court abused its discretion in sentencing Ressam as it did, including by basing that sentence on several findings that were clearly erroneous, the sentence is vacated as substantively unreasonable, and the case is remanded to the district court for resentencing.[11]

**SENTENCE VACATED; REMANDED FOR RESEN-TENCING**.

REINHARDT, Circuit Judge, with whom KOZINSKI, Chief Judge, and WARDLAW, Circuit Judge, join, specially concurring:

Although I concur in Judge Clifton's majority opinion, I write separately to explain the reasons for my hesitation in doing so.

I do not believe that this is an appropriate case in which to establish general principles governing when "substantive unreasonableness" will warrant vacating a sentence imposed by the district court. As the majority opinion states, decisions made under the standard applicable to substantive unreasonableness are "highly contextual and do not permit easy repetition in successive cases." Majority op. at 4705 (quoting *United States v. Rigas*, 583 F.3d 108, 123 (2d. Cir. 2009)). I agree that in substantive unreasonableness cases, as in certain other categories of cases, legal principles developed in one case or set of cases are not easily extrapolated and applied to

---

[11]The previous opinion for our court by the three-judge panel also directed that on remand the case be assigned to a different district judge. The government did not request that order of reassignment, and it reiterated that position during oral argument before this en banc panel. With confidence that the district court will take heed of this opinion, we do not order such reassignment.

other cases. The more specific we try to be as to how we must go about determining whether a sentence is substantively unreasonable, the less likely that the rules we adopt will bring us to a just and fair result in the wide range of cases that will come before us. Here, this principle is at its apex.

No case could be more atypical and less suited for the development of general substantive unreasonableness rules than the case of a foreign enemy terrorist who enters the United States to wage war on this nation. Our general sentencing principles do not easily fit this category of defendant, much less our principles regarding substantive unreasonableness. For example, as the majority opinion correctly states, the "overarching statutory charge for a district court is to 'impose a sentence sufficient but not greater than necessary' " to fulfill certain objectives, one of which is "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." Majority op. at 4707 (quoting *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (quoting 18 U.S.C. § 3553(a))). Surely, this objective is wholly inapplicable in the case of a foreign enemy terrorist. Similarly, a significant factor in determining the appropriate length of a sentence for those committing criminal offenses is ordinarily their past criminal history. *See id.* at 4707-08. What is a reasonable sentence for a first time offender will often be unreasonable for a defendant with a lengthy criminal record, and vice-versa. This is surely not the case with a foreign enemy terrorist. His previous criminal record is wholly irrelevant. Likewise, the need to "afford adequate deterrence" has little relevance in the case of a foreign enemy terrorist: the likelihood that those who seek at the behest of Al Qaeda or similar groups to damage our country will pay any heed to the length of the sentence they may face is nil.

Nevertheless, we must decide what is a substantively unreasonable sentence in Ressam's case. Because we do not distinguish in our statutes or guidelines between the length of sentences for ordinary criminals and foreign enemy terrorists,

we start with the applicable statutes, which in most cases give the district court a wide amount of discretion. We then apply the Sentencing Guidelines, which although advisory, provide a starting point from which the district court may, in its discretion, vary upwards or downwards after considering the statutes, Guidelines sentencing principles, and applicable Supreme Court and other controlling precedent. In Ressam's case, however, almost one half of the 22 year sentence imposed by the district court was non-discretionary because Ressam's conviction under 18 U.S.C. § 844(h)(2) for carrying an explosive in the commission of a felony subjected him to a mandatory consecutive sentence of ten years.

I find very little that would instruct a district court as to how to treat a foreign enemy terrorist other than to apply the terms of the statute under which he is convicted and next to consider the applicable guidelines range. I agree with both parties and the district judge that the extent to which the convicted foreign enemy terrorist has cooperated with and provided assistance to the United States in its war on terror may be a significant factor in reducing what might otherwise be an extremely lengthy sentence to a somewhat lesser one. Here, the defendant's sentence under the statute and the advisory guidelines would in the absence of such cooperation or other mitigating factors be a minimum of 65 years and a maximum of life in prison.

It appears to me that aside from cooperation with the government there are no other mitigating factors in the case of a foreign enemy terrorist, Ressam or any other. Whether when captured on American soil such foreign nationals should be sentenced under our general criminal statutes and afforded the same sentencing treatment as domestic criminals or whether their sentencing should be pursuant to special statutes or rules designed to afford particularized treatment to foreign enemies of the state is another matter — a matter for Congress, or possibly in some cases the Executive Branch. As long, however, as courts are required to sentence such defendants under laws

and rules applicable to ordinary domestic criminals, there seems to be little about the case of a foreign terrorist that would ordinarily justify less than a guideline sentence, other than his cooperation with the government or possibly a change of heart on his part. Here, the record clearly does not reflect the latter.

I agree with the majority that it is clear that the district court erroneously evaluated the extent of Ressam's cooperation. In particular, I find that his undermining of the prosecution of Abu Doha, a significant Al Qaeda figure, and Samir Ait Mohamed, a less important operative, in violation of his cooperation agreement, as well as his repudiation of the agreement itself, served to lessen significantly whatever credit he might otherwise have received for his limited implementation of the agreement. In any event, I would conclude that to the extent that the sentence was reduced substantially on account of his purported cooperation with the government, that reduction was clearly excessive and led directly to a sentence that was substantively unreasonable.

As the majority opinion notes, "[W]e review the substantive reasonableness of a criminal sentence under what the Supreme Court has described as the 'familiar abuse-of-discretion' standard of review." Majority op. at 4702 (quoting *Gall v. United States*, 552 U.S. 38, 46 (2007)). We have held that a district court abuses its discretion where it fails to "identif[y] the correct legal rule," *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc), or where, having identified the applicable legal standard, it applies the standard in such a way as to leave us with "the definite and firm conviction that a mistake has been committed," *id.* (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).[1]

---

[1]In *Hinkson*, we noted that in reviewing the factual aspects of the district court's determination we may feel such a "definite and firm conviction" only when the district court's application of the applicable legal rule was "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from facts in the record.' " *Id.* (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 577 (1985)).

In the end, in this case the statute and the guidelines leave us with a guideline range of 65 years to life. Treating Ressam's conviction, as we must, as ordinary criminal offenses rather than as acts of war, the offenses are indeed, as the majority states, "horrific." Majority op. at 4709. Taking into account a modest reduction for his initial cooperation with the government, I nevertheless have a "definite and firm conviction" that in this case a sentence of 22 years is without support in inferences that may be drawn from facts in the record and, without question, substantively unreasonable. In fact, treating the offense as ordinary criminal conduct, as I must, my definite and firm conviction would be that any sentence lower than one within the guideline range would meet that description.

An abuse of discretion standard is, as the majority opinion acknowledges, not always "clear or simple to apply." Majority op. at 4702. This is especially true in determining when we are left with "a definite and firm conviction" that the district court committed a clear error of judgment. Here, however, I have no difficulty in concluding without any reservation that under our ordinary criminal law the offense of which Ressam was convicted, specifically his participating in the conspiracy to blow up the Los Angeles International Airport on New Year's Day of the year 2000, and to murder hundreds or thousands of travelers and workers so as to create a state of chaos nationwide if not worldwide, mandates a sentence no less than that within the guideline range of 65 years to life.

In short, I concur generally with the majority and agree that the 22 year sentence must be vacated as substantively unreasonable, given that we are compelled to treat a foreign enemy terrorist in the same manner as we would a domestic criminal. What sentence I might otherwise find reasonable or unreasonable for a foreign enemy terrorist is of no import here and is a question that I am glad that I do not have to answer. Acts of war are indeed different from ordinary crimes, and our current war with terrorism is indeed different from ordinary wars.

I am far from certain that our government or our citizens have yet determined how to deal with these differences.[2]

Although I am concerned that a district judge might ordinarily have difficulty on remand in viewing this matter afresh given the sentencing history in this case, the district judge here is a dedicated, experienced and highly respected jurist who is fully capable of completing the assignment with which he has so dutifully struggled for the past 12 years. Accordingly, I, like the majority, would not remand to another judge.

---

SCHROEDER, Senior Circuit Judge, joined by PAEZ, BERZON and MURGUIA, Circuit Judges, dissenting:

I respectfully dissent. The majority holds substantively unreasonable a 22-year sentence that is 13 years less than the government's request in its sentencing memorandum, and only 8 years less than what the government conceded at oral argument it would have accepted without appealing to this court. In light of the district court's sentencing discretion, I would exercise a more appropriate level of deference, and affirm.

The district court's explanation of this sentence shows that the court followed this circuit's law. *See United States v. Maier*, 646 F.3d 1148, 1156 (9th Cir. 2011) (citing *United States v. Hinkson*, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc)). The court noted it could not presume that the advisory Guidelines range is reasonable. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). The court said

---

[2]Indeed, both Congress and the Executive Branch continue to be engaged in determining how foreign enemy terrorists should be treated. *See, e.g.*, Statement by the President on H.R. 1540 (Dec. 31, 2011), *available at* http://www.whitehouse.gov/the-press-office/2011/12/31/statement-president-hr-1540.

that it had considered the 18 U.S.C. § 3553(a) factors, in addition to the Guidelines, in arriving at the sentence it imposed. It went through each of those factors, explaining the weight it assigned to each, and why. The district court had lived with the case for nine years and its explanation reflects its familiarity with the history of the case and with the defendant.

The government has at no time contended that the district court committed procedural error in imposing this sentence, or that it made any clearly erroneous findings. In their sentencing memoranda, both sides sought sentences that amounted to substantial downward variances from the bottom end of the Guidelines range, which was 65 years. The defendant asked for a sentence of 15 years, and the government for 45. The 22-year sentence imposed was thus well within the range of alternatives proposed to the district court. (At the sentencing colloquy, only after the defendant said he would not object to any sentence that the district court imposed— even life—did the government up its recommendation to life.)

To justify its conclusion that the sentence is too low, the majority focuses on the district court's explanation of the weight it gave two of the relevant § 3553(a) factors.[1] The

---

[1]Section 3553(a) directs a court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the offender;

(2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

majority insists, though the government has never argued, that the explanation included at least two "findings of fact" that were "clearly erroneous." The first and most important was the weight given to Ressam's cooperation, and a second was the court's characterization of the life Ressam lived before his offense conduct. Yet these were not findings of fact, but part of the court's explanation of how it weighed the statutory sentencing factors.

The majority undoes the district court's sentence, and in so doing commits the same error that the Supreme Court ascribed to the Eighth Circuit in *Gall v. United States*, 552 U.S. 38 (2007). The Supreme Court faulted that circuit court for reweighing the § 3553(a) factors when the circuit court didn't like a district court sentence that was far below the

---

(4) the kinds of sentence and the sentencing range established for —(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines— (I) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced . . . ;

(5) any pertinent policy statement—(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense."

Guidelines range. In *Gall* the district court had given proba-
tion to a defendant involved in a large drug conspiracy and
facing a Guidelines minimum of 30 months. The Supreme
Court said:

> The Court of Appeals clearly disagreed with the dis-
> trict judge's conclusion that consideration of the
> § 3553(a) factors justified a sentence of probation; it
> believed that the circumstances presented here were
> insufficient to sustain such a marked deviation from
> the Guidelines range. But it is not for the Court of
> Appeals to decide *de novo* whether the justification
> for a variance is sufficient or the sentence reason-
> able. On abuse-of-discretion review, the Court of
> Appeals should have given due deference to the Dis-
> trict Court's reasoned and reasonable conclusion that
> the § 3553(a) factors, on the whole, justified the sen-
> tence. Accordingly, the judgment of the Court of
> Appeals is reversed.

*Id.* at 59-60.

   The majority makes the same mistake. When the three-
judge panel reversed Ressam's sentence, we voted to take this
case en banc because, presumably, a majority of our active
judges had serious reservations about the wisdom of the panel
majority's reversal, given the discretion the district court
enjoys in sentencing. The dissent of Judge Fernandez from the
original panel opinion had it right:

> So where does that leave the majority? Simply put,
> it seems to me that the majority just does not like the
> fact that this terrorist is to sit in prison for a mere
> twenty-two years. What number would the majority
> choose; who knows? But although many federal sen-
> tences are even more draconian, twenty-two years
> seems like a long time to me, whether a defendant is
> young or old to start with. It is not a mere slap on the

> wrist, especially if the confinement conditions will be especially harsh, as the district court predicted they would be. Yet, when all is said and done, the majority simply does not like the way the district court weighed the evidence before it; obviously the majority would have done it differently. . . .

> In short, the sentence was neither procedurally erroneous nor substantively unreasonable. See *Carty*, 520 F.3d at 993. Even if we have to grit our teeth to do so, we should let it be.

As well we should have had reservations about the panel majority's reversal of the district court's sentence. Only a year or so earlier, our court had gone en banc in *Hinkson*, to consider how the "abuse of discretion" standard of review "limits our power as an appellate court to substitute our view of the facts, and the application of those facts to law, for that of the district court." 585 F.3d at 1250. We said that we were approving a "newly stated 'abuse of discretion' test [that] requires us first to consider whether the district court identified the correct legal standard for decision of the issue before it . . . [and] then requires us to determine whether the district court's findings of fact and its application of those findings of fact to the correct legal standard, were illogical, implausible, or without support in inferences that may be drawn from facts in the record." *Id.* at 1251; *see also Maier*, 646 F.3d at 1156 n.3.

Such review for abuse of discretion is not rubber-stamping. It is the role of the appellate courts as mandated by the Supreme Court. *See Gall*, 552 U.S. at 57 (after review for procedural error, the appellate court then considers "substantive reasonableness . . . under an abuse-of-discretion standard").

Thus to me the majority opinion is all the more disturbing, because while it cites *Hinkson*, it never comes to grips with the impact *Hinkson*'s holding should have had on this case.

There is no question in my mind that the district court in this case identified the correct legal standard for its decision, as laid down by the Guidelines and § 3553(a). It applied that standard to the facts before it, explaining its application of the § 3553(a) factors and relying on nothing that could be said to be "illogical, implausible, or without support" in the record. *Hinkson*, 585 F.3d at 1251.

This is best illustrated by comparing the way the district court evaluated the defendant's cooperation with the way the majority attempts to disregard it. The majority's obsession with the magnitude of the crime the conspiracy planned to commit has led the majority to distort both the record and how the district court exercised its discretion on the basis of that record. The majority has apparently decided that the district court both weighed Ressam's cooperation too heavily and failed adequately to account for the fact that it ended. The district court's explanation of how it weighed Ressam's cooperation, however, was not a finding of fact susceptible to clear error review. Rather, the court explained how it weighed the statutory sentencing factors, which must include, in addition to the nature and circumstances of the crime, the defendant's history and characteristics. § 3553(a)(1). The Guidelines, in § 5K1.1, allow the government to request a downward departure for substantial assistance, and the government asked for one here. At sentencing, the district court reviewed Ressam's history of cooperation, including the benefits of his cooperation and the unfortunate consequences of his cessation and partial recantation. That history is fully in accord with the record in this case.

Of particular salience to the district court was the intelligence Ressam provided to the United States and to foreign governments about terrorist methods and organizations. The majority brushes this information aside by noting the government's assertion that the information Ressam provided was not unique to him. While some of this information was previously known to the United States intelligence community,

Ressam's position as an unclassified source permitted the United States to disseminate this intelligence to foreign allies. That was what the district court relied upon.

Other evidence in the record supports the district court's assessment of the overall value of Ressam's cooperation. The United States Attorney for the Southern District of New York filed a thirty-nine page letter with the court below, detailing how Ressam had earlier provided extensive cooperation. Although the end of Ressam's cooperation burdened the government's ability to pursue several criminal prosecutions, he provided a wealth of information otherwise not susceptible to later recantation or retraction. Ressam also provided, for example, operational assistance to investigators tasked with defusing the explosive device carried by Richard Reid, the "shoe bomber." The district court therefore accurately characterized Ressam's role as an informant as having contributed "extensive intelligence that proved to be invaluable in the fight against international terrorism."

Having concluded, incorrectly, that Ressam's information had no value, the majority dismisses as "clearly erroneous" the district court's observation that recognizing the value of Ressam's cooperation would serve as an incentive for future terrorist informants. The problem is that while the district court focused on the net value to the government of Ressam's cooperation—taking into account its cessation—the majority focuses on the cessation and never confronts the district court's assessment of net value.

The majority goes so far as to suggest that the district court abused its discretion by not adopting the government's position that Ressam should receive no credit for his cooperation because it did not continue. The majority may disagree with the weight the district court assigned to the net value of Ressam's cooperation, yet the district court's assessment of the net value and the weight it assigned that value as a sentencing factor were matters within its discretion to decide. *See United*

*States v. Gutierrez-Sanchez*, 587 F.3d 904, 908 (9th Cir. 2009). The district court considered the entire history of Ressam's cooperation. Just as we should not rubber-stamp the district court, we should not suggest the district court must rubber-stamp the government's sentencing positions. *See, e.g., United States v. Livesay*, 525 F.3d 1081, 1091 (11th Cir. 2008) ("[A]fter the government has made a motion for downward departure pursuant to U.S.S.G. § 5K1.1 the government has no control over whether and to what extent the district court will depart from the Guidelines."). The Guidelines require the court to give "substantial weight" to the government's assessment, U.S.S.G. § 5K1.1, cmt. 3, but any such assessment must reflect the entire history of cooperation up to the time of sentencing. *See United States v. Awad*, 371 F.3d 583, 588 (9th Cir. 2004).

It is thus important to comprehend fully how scrupulously the district court followed § 3553(a) in weighing each of its factors. I therefore turn first to the district court's analysis, and then, sadly, observe the similarities of this case to *Gall*— a further illustration of Santayana's adage that those who do not study history are condemned to repeat it. George Santayana, 1 *The Life of Reason* 284 (1905).

The district court, true to the commands of § 3553(a), expressly recognized the need for the sentence to reflect the seriousness of Ressam's offenses, and to provide just punishment and promote respect for the law. The court began by setting forth the legal standard:

> The Ninth Circuit has made clear that the Sentencing Guidelines are only one factor to be considered among those factors set forth in 18 U.S.C. Section 3553(a), in determining an appropriate sentence. I may not presume that the Guidelines range is reasonable. Nor should the Guidelines factor be given more or less weight than any other factor. Accordingly, I

have also considered the other Section 3553 factors in arriving at the sentence I am imposing today.

The district court then turned to the seriousness of Ressam's offenses:

> On the one hand I recognize the need for the sentence imposed to reflect the seriousness of the offenses Mr. Ressam has committed, to provide just punishment for those offenses, and to promote respect for the law. Mr. Ressam's crimes, if carried to their intended conclusion, would have resulted in the deaths and injuries of hundreds of innocent people and instilled fear across the country and even the world. Fortunately, Mr. Ressam's arrest prevented such an outcome. Because of the worth of an attentive Port Angeles Customs Inspector, Mr. Ressam's crimes did not lead to loss of life or limb, nor destruction of property. Nevertheless, the seriousness and heinousness of the act of terrorism Mr. Ressam was carrying out at the time of his arrest cannot be understated.

The court described Ressam's cooperation in cases that were successfully prosecuted, and the basis of the government's motion for a downward departure:

> On the other hand, I recognize Mr. Ressam's extensive and valuable cooperation in the fight against terrorism during the first two years after his trial. Although it ended unwisely and prematurely, Mr. Ressam's cooperation, unique in its breadth and scope, weighed heavily in my initial sentencing decision and its import has not changed in my analysis today. The government's 5K1.1 motion filed in February 2003 requested a downward departure from the Sentencing Guidelines based on Mr. Ressam's substantial assistance in the case of *United States versus*

*Moktar Haoauri*, a matter prosecuted in the Southern District of New York in the Summer of 2001 and resulting in the conviction of Mr. Haouari.

Mr. Haouari was sentenced in 2002 to a term of 24 years' imprisonment. Mr. Ressam's testimony at the trial connected Mr. Haouari to the terrorist plot, of which Mr. Ressam himself was a part, to bomb the Los Angeles International Airport on New Year's Day 2000. In addition to his substantial cooperation in that case Mr. Ressam also testified before a German tribunal on behalf of the German government in the trial against Mounir el Motassadeq . . . in December 2002, which resulted in a conviction and sentence of 15 years.

The district court then acknowledged the negative effects of Ressam's decision to end cooperation and retract his statements, a decision that led to dismissal of two prosecutions. It concluded other information Ressam provided about international terrorist activity outweighed those negative effects:

The Court recognizes that Mr. Ressam's later decision to end his cooperation resulted in the dismissal of two pending prosecutions and the retraction of certain of his statements against two other terrorist suspects. However, Mr. Ressam's cooperation, while it lasted, provided the United States government and the governments of Great Britain, Spain, Italy, Germany, France and Canada extensive intelligence that proved to be invaluable in the fight against international terrorism. The defendant's sentencing memorandum submitted before the July 2005 sentencing hearing summarizes the far-reaching impact of Mr. Ressam's cooperation on the investigations and prosecutions of terrorist activities in this country and abroad.

Finally, the district court turned to the subject of fairness and of the impact of confinement Ressam had already and would continue to experience:

> Downplaying the cooperation that Mr. Ressam provided the government would diminish the likelihood of future cooperation by other apprehended terrorists. Further, doing so would not be fair to Mr. Ressam. After his trial he told me that the fairness of his trial was not what he expected, given what he had done. The fair treatment that Mr. Ressam received in his public trial was a major influence on his decision to break with his past and cooperate, a choice that undoubtedly saved innocent lives. In making that decision, he put his own life at risk. In addition, he has spent years in solitary confinement in a country far from his family and loved ones and will, by any measure, be sacrificing a large portion of his life for his crimes.

The majority thinks that the district court gave too much weight to the value of Ressam's cooperation, and too little weight to the effect of his cessation of cooperation. Yet, as the discussion above reveals, its position mirrors that of the Eighth Circuit in *Gall*, where the Supreme Court described such reweighing as de novo review that failed to give adequate deference to the district court. The Eighth Circuit in *Gall*, for example, had erred by saying that the district court gave "too much weight to Gall's withdrawal from the conspiracy." 552 U.S. at 45. The majority here says that the district court gave too much weight to the information Ressam provided during his cooperation. If the Eighth Circuit's conclusion was improper de novo review, then so is the majority's.

The majority also concludes that the district court was "clearly erroneous" in characterizing Ressam's prior life as "quiet, solitary, and devout," and that this history "support[ed] favorable sentencing consideration." The district

court was accurately describing what the record showed about the defendant's life before his mid-twenties, and, in any event, gave it no undue weight. The district court was following the statutory requirement that it look both to "the nature and circumstances of the offense and the history and characteristics of the defendant." § 3553(a)(1).

The majority appears to justify its focus on the nature of the offense, rather than on any of the other relevant statutory factors, because the majority apparently thinks—as my colleague Judge Reinhardt's concurrence makes explicit—that terrorism is different, and Ressam's offense more terrible than the district court appreciated. Nothing in the record bears this out. The district court was well aware of the statutory command to consider the circumstances and seriousness of the offense in sentencing. § 3553(a)(1). It did consider them, explaining that the "seriousness and heinousness of the act of terrorism Mr. Ressam was carrying out at the time of his arrest cannot be understated." The district court had to weigh *all* the factors in arriving at a sentence sufficient, but not greater than necessary, to serve the purposes of punishment. § 3553(a).

The statutes and Guidelines treat terrorism as a matter of serious criminal concern, but not as something new and different. The majority's implicit assumption that terrorism is different, and must be treated differently, thus flies in the face of the congressionally sanctioned structure of sentencing that applies to terrorism as well as all other kinds of federal criminal offenses. Our courts are well equipped to treat each offense and offender individually, and we should not create special sentencing rules and procedures for terrorists. In presiding over the many terrorism-related cases on their dockets, courts have treated other issues in terrorism cases in ways that do not differ appreciably from more broadly applicable doctrines. *See, e.g., Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2079, 2083 (2011) (holding that ordinary qualified immunity standard protects officials in a suit alleging an unconstitutional use of the material witness statute for detaining terrorism sus-

pects); *Jewel v. Nat'l Sec. Agency*, ___ F.3d ___, 2011 WL 6848406, *1, 3-7 (9th Cir. 2011) (concluding that a putative class representative had constitutional and prudential standing to challenge the government's post-September 11 policy of widespread warrantless eavesdropping); *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 157, 167 (2d Cir. 2008) (applying traditional principles to hold that the Fourth Amendment's Warrant Clause has no extraterritorial application and that foreign searches of U.S. citizens conducted by U.S. agents are subject only to the Fourth Amendment's requirement of reasonableness); *MacWade v. Kelly*, 460 F.3d 260, 263 (2d Cir. 2006) (upholding government's use of random, suspicionless container searches in the New York City subway system, on grounds that preventing a subway terrorist attack is a non-investigative special need within the meaning of Fourth Amendment doctrine); *see also* Aziz Huq, *Against National Security Exceptionalism*, 2009 Sup. Ct. Rev. 225, 226 (concluding that courts' responses to national security emergencies do not treat terrorism as different, but rather "align more closely with . . . judicial responses to non-security emergencies"). Just as we have resisted treating terrorism differently in these cases, we ought to resist doing so in reviewing sentences for reasonableness as well.

The majority expresses concern that the 22 years meted out, including years already served, means that Ressam will be only 51 years old at the time of his release. The district court, of course, was well aware of Ressam's age, having presided over his case for nine years and having faced him at two sentencings. The district court thus took into account what the majority does not: precisely because Ressam is a convicted terrorist, he will be kept in solitary confinement "in a country far from his family . . . and will by any measure, be sacrificing a large portion of his life for his crimes." Ressam is currently confined at the Administrative Maximum Facility in Florence, Colorado, where a number of terrorist offenders are held. There inmates are "sealed off for 23 hours a day in cells with four-inch-wide windows and concrete furniture," and

may receive "an hour's exercise each day in a tiny yard, . . . alone, . . . if they behave." Judith Resnik, Essay, *Detention, The War on Terror, and the Federal Courts*, 110 Colum. L. Rev. 579, 678 n.425 (2010) (quoting Peter Finn, *Detainees Face Severe Conditions if Moved to U.S.*, Wash. Post, Oct. 4, 2009, at A6).

The majority's assumption that upon release from prison after decades of such confinement, Ressam would engage in further terrorist conduct, is speculative, unwarranted, and without support in the record, including the sealed presentence report. The available evidence in the record reflects experts' beliefs that Ressam posed little threat of future dangerousness to himself or others. The sealed presentence report noted that monthly psychological evaluations were conducted during Ressam's time in custody. Ressam's counsel engaged Dr. Stuart Grassian, a psychiatrist, to evaluate his mental state in 2003 and 2004. Dr. Grassian's report concluded that Ressam would not be a danger to the community upon release. The majority's assumption of future dangerousness is, therefore, contradicted by the record evidence. Its further prediction that Ressam would return to Algeria upon release to inspire future terrorists, is pure speculation unsupported by any record evidence.

The majority cites the Eleventh Circuit in *United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011), where that court made a similar assumption of future dangerousness. Although the Eleventh Circuit acknowledged the general presumption that recidivism rates decrease as offender age increases, it relied on its previous holding that the presumption does not apply to certain sex offenders, and held the presumption should not apply to terrorists either. The comparison of terrorists to sex offenders in terms of their recidivism is criticized in Judge Barkett's dissent, and I believe the dissent has the better of the argument. *See id.* at 1117-19 (noting that the previous holding as to sex offenders had been based on empirical studies about recidivism, and explaining that the assumption

about terrorists was without any support in the record). Here, as in *Jayyousi*, the majority faults the district court for failing to make findings that would have had no basis in the record. The district court here made no such error, and its reasoning reflects a measured consideration of the record.

The majority also takes the district court to task for looking to sentences given to other terrorists. The district court compared Ressam's case to other terrorist prosecutions that were, of course, different from Ressam's in that the other defendants pleaded guilty or were convicted of less serious offenses. Those defendants also did not cooperate with the government, as Ressam did for a considerable period. One can speculate that the district court placed too much emphasis on these comparisons, even given the statutory admonition that the court consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6). The important point, however, is the factor was one that the district court had to weigh, and is not for us to reweigh. *See Gall*, 552 U.S. at 51. The district court did the best it could to evaluate possible disparities with sentences of other convicted terrorists while remaining fully aware of the fact that Ressam's case was not similar to those in all respects. Its efforts to follow the statutory sentencing factors lend no support for the majority's conclusion that the district court's sentence was unreasonably low.

In avoiding unwarranted disparities, as in evaluating other key sentencing factors, district courts have enormous discretion. The Supreme Court has consistently instructed us, and we have reminded ourselves, that the appellate courts cannot substitute their judgment for that of the district judge. *See, e.g.*, *id.* at 51 ("The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court."); *see also Koon v. United States*, 518 U.S. 81, 97 (1996) ("[I]t is not the role of an appellate court to substitute its judgment for

that of the sentencing court as to the appropriateness of a particular sentence.") (citations omitted); *accord Carty*, 520 F.3d at 993 ("We may not reverse just because we think a different sentence is appropriate."); *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (per curiam) ("Even if we are *certain* that we would have imposed a different sentence had we worn the district judge's robe, we can't reverse on that basis.") (emphasis added). The majority seemingly ignores all this law.

The majority's criticisms of the district court, and this dissent, amount to no more than disagreement with the 22-year sentence imposed. That is not enough to warrant reversal. The district court carefully explained its reasons for imposing that sentence, as we have required in order to facilitate "meaningful appellate review." *Carty*, 520 F.3d at 992. But the burden is not on the district court to establish that its sentence is reasonable. Rather, the appellate court must affirm unless the district court committed procedural error or imposed a substantively unreasonable sentence. *See id.* at 993; *Gall*, 552 U.S. at 51. The majority has not satisfied its burden of showing the district court's sentence was unreasonable.

Not only does the majority make the same mistakes for which the Supreme Court reversed the Eighth Circuit in *Gall*, but it overlooks another, somewhat eerie, similarity between this case and *Gall*. As the Supreme Court noted, the trial judge in *Gall* was extremely experienced, having sentenced nearly 1000 offenders. *See* 552 U.S. at 52 n.7. The district judge's experience in this case is comparable, for a search of LexisNexis Analyzer docket records showed that this judge has presided over at least 1000 criminal dockets. The district court's experience here, as in *Gall*, should make us even more cautious in our deferential review. We defer to the district courts' exercise of discretion—regardless of experience—because of the differing day-to-day roles of trial and appellate judges. *See Hinkson*, 585 F.3d at 1259-60. In *Hinkson*, we explained why we apply deferential review to the district

courts' factual and discretionary decisions, referring to the district courts' "experience with the mainsprings of human conduct," so that "the concerns of judicial administration will favor the district court." *Id.*

The majority disregards that wisdom, and contorts our proper institutional role here. In our everyday lives we often say that we should all practice what we preach. As an appellate court we are bound by law either to practice what we have preached, or to repudiate it. The majority does neither.

I therefore must respectfully, but regretfully, dissent.